UNITED STATES of America,
Plaintiff,

v.

Donald Scott TAYLOR, Defendant.

Case No. CR 07–1244 WJ.

United States District Court,
D. New Mexico.

Oct. 9, 2009.

Brian A. Pori, Inocente, P.C., Albuquerque, NM, Lori Tiffany Flowers, Michael N. Burt, San Francisco, CA, for Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO EXCLUDE FIREARM IDENTIFICATION EVIDENCE

WILLIAM P. JOHNSON, District Judge.

**THIS MATTER** comes before the Court on Defendant Taylor's Motion to Exclude Firearm Identification Evidence [Doc. 277]. The Court held a *Daubert* hearing on this motion on September 2nd and 3rd, 2009, at which the Court heard the testimony of Defense expert Adina Schwartz, Ph.D. (Dr. Schwartz), and Government expert Ron G. Nichols (Mr. Nichols). Having considered the parties' written and oral arguments, the testimony of Dr. Schwartz and Mr. Nichols, and the applicable law, the Court finds that Defendant's motion is not well taken and shall be **DENIED.** However, the Court will limit certain parts of Mr. Nichols' opinion testimony, as described below.

### INTRODUCTION

On July 8, 2005, deputies were dispatched to the Causey, New Mexico home

of Jimmy S. "Bo" Chunn when they discovered that Mr. Chunn had been killed by a gunshot wound to the head fired from a high-powered rifle. The bullet believed to have killed Mr. Chunn ultimately lodged in his refrigerator door. The preliminary investigation revealed that Defendant had contact with Mr. Chunn shortly before his death. Thus, Defendant became a person of interest. Investigating officers learned that Defendant had a meeting scheduled with his probation officer and decided to attend. During that meeting Defendant denied having any contact with Mr. Chunn since his release from prison in April, 2005. After the meeting, the probation authorities searched Defendant's car and found a knife, beer, and ammunition. Taylor was arrested for violating his probation and placed in state custody.

While in the custody of the New Mexico Department of Corrections, Defendant developed a relationship with Donnie Wilson, an Aryan Brotherhood member who had begun cooperating with the FBI and who had been placed, at the request of the FBI, in a cell adjacent to the cell where Defendant was being housed. Wilson was asked to determine whether Defendant had any involvement in the murder of Mr. Chunn. Defendant eventually admitted to Wilson that he killed Mr. Chunn, and told him that he used a .30–.30 caliber rifle in the murder. Defendant also told Wilson that a number of weapons, including the murder weapon, were hidden and needed to be disposed of. Wilson told Defendant about another Aryan Brotherhood member on the outside who could dispose of the weapons. In reality, this other Aryan Brotherhood member was an undercover law enforcement officer. Thereafter, without any prompting from Wilson, Defendant drew Wilson a map showing the location of the hidden weapons. The FBI used that map to obtain a search warrant for the abandoned house where Defendant said he hid the weapons. When the warrant was executed, the officers found, along with other weapons, a .30–.30 caliber rifle matching the description Defendant gave Wilson of the weapon he used to kill Mr. Chunn.

The recovered rifle and the projectile removed from Mr. Chunn's refrigerator door were presented to Steve Guerra, a firearms examiner with the New Mexico Department of Public Safety, for firearms identification analysis. On April 20, 2009, the Government filed an Amended Notice of Expert Testimony [Doc. 235], declaring its intent to call Mr. Guerra to offer expert opinion testimony based on the results of his analysis. However, the Government subsequently withdrew Mr. Guerra as a witness and instead, on August 5, 2009, notified Defendant of its intent to offer the expert opinion testimony of Ronald G. Nichols, a firearm and toolmark examiner with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, who also performed an examination of the recovered rifle and the bullet believed to have killed Mr. Chunn [Doc. 425]. Mr. Nichols will testify that in his opinion there is a match between the recovered bullet and the recovered rifle. In the instant motion Defendant seeks to have all firearms identification evidence excluded, arguing that it is unreliable, invalid, and does not meet the requirements for admissibility of expert testimony. See Deft. Brf. [Doc. 277] at 1.

## I. Mr. Nichols' Qualifications

Mr. Nichols is currently employed as a firearm and toolmark examiner with the Bureau of Alcohol, Tobacco, Firearms, and Explosives in Walnut Creek, California. He graduated from the State University of New York at Buffalo with a bachelor of science degree in forensic science. He was employed with the Oakland, California Police Department from approximately 1999

to 2000, where he received extensive in-service training with regard to firearm and toolmark identification, which included a number of training exercises as well as becoming familiar with the pertinent literature in the field. This training culminated in Mr. Nichols taking and passing a series of proficiency tests. He holds several certifications in the field of firearm and toolmark identification, including one with the American Board of Criminalistics and three with the Association of Firearm and Toolmark Examiners (AFTE). The three certifications with AFTE are in firearm evidence examination, toolmark evidence examination and identification, and gunshot residue evidence examination and identification. He regularly attends training conferences and participates in ongoing proficiency testing. Mr. Nichols has also published several articles on the topic of firearm and toolmark identification.

## II. Applicable Legal Standard

The admissibility of expert opinion testimony is governed by Federal Rule of Evidence 702, which codified the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence, or to determine a fact on issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*See also United States v. Baines*, 573 F.3d 979, 985 (10th Cir.2009) (quoting Fed. R.Evid. 702). It is the duty of the trial court to ensure that any expert testimony admitted "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786. The burden of proof is on the proponent of the expert. *Baines*, 573 F.3d at 985. In *Daubert*, the Supreme Court set out a non-exhaustive set of factors that trial courts may consider in determining whether proposed expert testimony is based on reliable methods and principles: (1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community. 509 U.S. at 593–94, 113 S.Ct. 2786.

■ *Daubert* itself was limited to scientific evidence, *see Baines*, 573 F.3d at 985, but in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court made clear that the gatekeeping obligation of the district courts described in *Daubert* applies, not just to scientific testimony, but to all expert testimony. *Id.* at 141, 119 S.Ct. 1167. While a district court may consider the *Daubert* factors in determining the admissibility of non-scientific expert testimony to the extent they are relevant, *id.* at 150, 119 S.Ct. 1167, "the test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 141–42, 119 S.Ct. 1167. Many courts have recognized that the list of factors the Supreme Court outlined in *Daubert* "may not perfectly fit every type of expert testimony, particularly technical testimony based primarily on the training and experi-

ence of the expert." *United States v. Monteiro*, 407 F.Supp.2d 351, 357 (D.Mass. 2006) (compiling cases).

■ Should the trial court find that the general methodology underlying the proposed expert testimony is both relevant and sufficiently reliable, it must then evaluate the proposed vehicle for that testimony: the expert himself. The court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to be a proponent of the specialized methodology. Fed.R.Evid. 702. The court must further determine whether the witness has reliably applied that methodology to the facts of the particular case. *Id.*

The United States District Court for the District of Massachusetts has clearly articulated the competing policy interests that must be balanced in the evaluation of proposed expert testimony; "The Court's vigilant exercise of this gatekeeper role is critical because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand knowledge, and because an expert's testimony may be given greater weight by the jury due to the expert's background and approach." *Monteiro*, 407 F.Supp.2d at 358. "The Court must, however, keep in mind the Supreme Court's admonition that, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786).

## DISCUSSION

### I. Brief Overview of Firearms Analysis

■ Firearms, like most tools, are produced through a manufacturing process. The field of firearms identification is based on the theory that this manufacturing process will leave unique microscopic markings on each gun, some number of which will be transferred to a bullet fired from that gun. These markings will fall into one of three categories. They will either be "class characteristics," which are markings that appear on all bullet casings fired from the same type of weapon, "subclass characteristics," which are left on all bullet casings fired from one of a group of guns mass-produced at the same time, or "individual characteristics," which are unique to a single gun. *See United States v. Green*, 405 F.Supp.2d 104, 107 (D.Mass. 2005). These characteristics exist because gun manufacturers purposely cut spiral grooves, called rifling, into the barrel of each gun so that bullets will travel straighter and longer distances once fired. The contact between the bullet and the rifling in the barrel leaves "lands" and "grooves" on the bullet. The grooves are the spaces cut out by the rifling, and the lands are the ridges where no material has been cut away. In addition to the general rifling characteristics, a gun's barrel will also impart individual marks, or "stria," onto a bullet. These unique "individual characteristics" are the result of random and microscopic flaws in the barrel manufacturing process and of the actual use of the firearm over time.

The firearms examiner uses a comparison microscope to examine the markings on at least two bullets, one of which is known to have been test fired from a particular weapon. If the individual markings on the two bullets show sufficient similarity, the examiner can conclude that the bullets were fired from the same weapon. Sufficient similarity exists when the bullets, viewed by a trained and experienced firearms examiner, evince sufficient duplication of markings that they can be considered individual characteristics, and the likelihood that another gun could have made them is so remote that it can be discounted.

Certain aspects of the question of the admissibility of Mr. Nichols' proposed testimony arc easily resolved. Defendant does not dispute, and the Court hereby finds, that Mr. Nichols is abundantly well-qualified to give expert opinion testimony on firearms identification generally and on the identification he made with respect to the suspect weapon and projectile in this case in particular. Furthermore, the Court finds that this evidence is both relevant and sufficiently technical that Mr. Nichols' testimony will assist the trier of fact to understand it. Finally, the Court finds, and Defendant again does not dispute, that Mr. Nichols reliably applied the methodology of his field of firearms examination. He testified in detail about the process he used to analyze the suspect rifle and bullet in this case and about the basis for his conclusion that there was a match between them. He further testified about the microphotographs he took of his observations of the recovered bullet and various test fires in the comparison microscope, and used copies of those photographs to explain how he reached his conclusion. Mr. Nichols additionally explained the extensive narrative documentation he made of his observations. Finally, he testified that his work in this case was peer-reviewed after he made his determination.

The dispute with respect to Mr. Nichols' proposed testimony is not whether Mr. Nichols himself accurately and faithfully applied the methodology used by firearms examiners in the field. The dispute is, rather, whether the pattern-based methodology employed by firearms examiners, including Mr. Nichols, is sufficiently reliable to be admissible under Rule 702 and Daubert/Kumho.

## II. *Daubert* Analysis

The use of firearm identification evidence in criminal trials is hardly novel. "For decades, both before and after the Supreme Court's seminal decisions in *Daubert* and *Kumho Tire*, admission of the type of firearm identification testimony challenged by the defendants has been semi-automatic; indeed, no federal court has yet deemed it inadmissible." *United States v. Monteiro*, 407 F.Supp.2d 351, 364 (D.Mass.2006). Because firearms identification evidence has been so routinely admitted, *see, e.g., United States v. Hicks*, 389 F.3d 514 (5th Cir.2004); *United States v. Santiago*, 199 F.Supp.2d 101, 111 (S.D.N.Y.2002), "[c]ourts have understandably been gun shy about questioning the reliability of [such] evidence." *Monteiro*, 407 F.Supp.2d at 364. However, as one district court recently put it, "storm clouds ... are gathering." *Id.* Because of the seriousness of the criticisms launched against the methodology underlying firearms identification, both by various commentators and by Defendant in this case, the Court will carefully assess the reliability of this methodology, using *Daubert* as a guide.

### (a) Whether the particular theory can be and has been tested

█ The basic theory underlying firearm identification, and all toolmark identification for that matter, is that each individual tool leaves unique marks which can be used to identify it to the exclusion of all other tools. Defendant argues that this theory is both false and unfalsifiable.

According to a recent National Academies Report, "The validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated." *Ballistic Imaging, Committee to Assess the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database*, National Research Council of the National Academies, 3 (2008). That report went on to state, "A significant amount of research would be needed to scientifically

determine the degree to which firearms-related toolmarks are unique or even to qualitatively characterize the probability of uniqueness." *Id.* It is important to note that the Committee that generated that report was focused on the feasibility of a national ballistics database, and the Committee was careful to point out that its report was not meant to be an overall assessment of firearms identification as a discipline. However, the Committee also recognized that the question of the feasibility of a national ballistics database was inextricably intertwined with the question of "whether a particular set of toolmarks can be shown to come from one weapon to the exclusion of all others," and thus the Committee felt compelled to point out the weaknesses in that theory.

■ Nonetheless, the Committee went on to say, "Not withstanding this finding, we accept a minimal baseline standard regarding ballistic evidence. Although they are subject to numerous sources of variability, firearms-related toolmarks are not completely random and volatile; one can find similar marks on bullets and cartridge cases from the same gun." *Id.* This conclusion is supported by a variety of studies that have been referenced before this Court demonstrating that the methods underlying firearms identification can, at least to some degree, be tested and reproduced. For example, in his article, *The Scientific Foundations of Firearms and Tool Mark Identification—A Response to Recent Challenges*, 16–17, CACNews 2nd Quarter 2006, Mr. Nichols makes reference to several studies in which hundreds or even thousands of bullets were fired from the same gun. In each case examiners found that, while some changes were observed over the course of the numerous firings, it was nonetheless possible to identify the first and last bullet as having been fired from the same gun. *Id.* Admittedly, these do not appear to have been "blind" studies. It seems the examiners who

found that an identification was possible knew the bullets had all been fired from the same gun. Nonetheless, these kinds of results do suggest at least some level of reproducibility.

Furthermore, Mr. Nichols testified that industry standards generally require an examiner to document in detail, through note-taking and photographs, the basis for his findings. Mr. Nichols also testified that industry standards require confirmation by at least one other examiner when the first examiner reaches an identification. *See also Monteiro*, 407 F.Supp.2d at 368 (noting same); *United States v. Diaz*, No. CR 05–167, 2007 WL 485967, at *5 (N.D.Cal. Feb. 12, 2007) (noting same). These factors, too, indicate at least some significant level of testability and reproducibility.

**(b) Whether the theory has been subjected to peer review and publication**

■ The Supreme Court in *Daubert* explained that "publication in a peer reviewed journal [is] a relevant, though not dispositive consideration in assessing the validity of a particular technique or methodology on which an opinion is premised." *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786. The Association of Firearm and Toolmark Examiners (AFTE), the principle professional organization for firearms and toolmark examiners, publishes a peer-reviewed journal, the *AFTE Journal*. Furthermore, the Government cites two articles in the *Journal of Forensic Science*, another peer-reviewed publication, on the subject of firearm and toolmark identification. Govt. Resp. Brf. [doc. 313] at 20. Therefore, this factor clearly weighs in favor of admissibility.

**(c) The known or potential rate of error**

■ *Daubert* directs that, "in the case of a particular scientific technique, the

Court ordinarily should consider the known or potential rate of error." 509 U.S. at 594, 113 S.Ct. 2786. One of Defendant's most strenuously-made arguments is that, in the case of firearms identification, it has been widely acknowledged that, "because the process is so subjective and qualitative, it 'is not possible to calculate an absolute error rate for routine casework.'" *Monteiro*, 407 F.Supp.2d at 367 (quoting Richard Grzybowski et al., *Firearm/Toolmark Identification: Passing the Reliability Test Under Federal and State Evidentiary Standards*, 35 AFTE J. 209, 213 (2003)).

In his testimony at the *Daubert* hearing in this case, Mr. Nichols agreed that no actual error rate has been calculated for the field at this point. However, both Mr. Nichols and the Grzybowski article, cited by the Government, make reference to proficiency testing done by the Collaborative Testing Service (CTS), from which potential error rates may be derived. Data from CTS testing done between 1978 and 1991 suggest that the rate of false identification is less than 1%. However, both Mr. Nichols and the Grzybowski article acknowledge that uneven test administration, make-up, and level of difficulty significantly limit the usefulness of this result. Nonetheless, this number at least suggests that the error rate is quite low.

### (d) The existence and maintenance of standards controlling the technique's operation

■ Arguably the biggest obstacle facing any firearms examiner is that there is no such thing as a "perfect match." Even two bullets known to have been fired consecutively from the same gun will display some differences. *See* Alfred A. Biasotti, *A Statistical Study of the Individual Characteristics of Fired Bullets*, 4 Forensic Sci. 34, 44 (1959). Even more problematic, bullets fired from different guns may have significantly similar markings, reflecting class or sub-class, rather than individual, characteristics. The practice in the field, therefore, as embodied in the AFTE Theory of Identification, calls on examiners to declare an identification only "when the unique surface contours of two toolmarks are in 'sufficient agreement.'" The AFTE Theory continues: "This 'sufficient agreement' is related to the significant duplication of random toolmarks as evidenced by the correspondence of a pattern or combination of patterns of surface contours.... Agreement is significant when it exceeds the best agreement demonstrated between toolmarks known to have been produced by different tools and is consistent with agreement demonstrated by toolmarks known to have been produced by the same tool."

The AFTE Theory, thus, does not provide any uniform numerical standard examiners can use to determine whether or not there is a match and, indeed, Mr. Nichols indicated in his testimony that most AFT examiners do not use any numerical standard. Instead, the AFTE theory is circular. An examiner may make an identification when there is sufficient agreement, and sufficient agreement is defined as enough agreement for an identification. *See Monteiro*, 407 F.Supp.2d at 370. The conclusion that there is a match between a recovered bullet and a particular gun is, therefore, necessarily a subjective one, "... held in the mind's eye of the examiner and ... based largely on training and experience in observing the difference between known matching and known non-matching impression toolmarks." *Monteiro*, 407 F.Supp.2d at 362–63 (quoting Grzybowski et al., *supra*, at 213).

A Committee of the National Academy of Sciences acknowledged this problem in a 2009 report. "AFTE standards acknowledge that these decisions involve subjective qualitative judgments by examiners

and that the accuracy of examiners' assessments is highly dependent on their skill and training." *Strengthening Forensic Sciences in the United States: A Path Forward,* Committee on Identifying the Needs of the Forensic Sciences Community; Committee on Applied and Theoretical Statistics, National Research Council, 5–20 (2009). The Committee went on to say that, "a fundamental problem with toolmark and firearms analysis is the lack of a precisely defined process.... AFTE has adopted a theory of identification, but it does not provide a specific protocol." *Id.* at 5–21. At one point the Committee concluded that, "[e]ven with more training and experience using new techniques, the decision of the toolmark examiner remains a subjective decision based on unarticulated standards and no statistical foundation for estimation of error rates." *Id.* at 5–20. Even the Government concedes that "the field continues to rely on a subjective match standard." Govt. Resp. [Doc. 313] at 20. *See also Monteiro,* 407 F.Supp.2d at 371–72 ("[O]ne critical problem with the AFTE Theory [of toolmark identification] is the lack of objective standards.... [T]here is no generally accepted standard for distinguishing between class, subclass, and individual characteristics."); *United States v. Green,* 405 F.Supp.2d 104, 114 (D.Mass.2005) ("In effect, there are no national standards to be applied to evaluate how many marks must match."); *United States v. Glynn,* 578 F.Supp.2d 567, 572 (S.D.N.Y.2008) ("[B]allistics opinions are significantly subjective. Moreover, the standard defining when an examiner should declare a match—namely "sufficient agreement"—is inherently vague.").

(e) Whether the technique has achieved general acceptance in the relevant scientific or expert community

The AFTE Theory appears to be widely accepted by trained firearms examiners, although it is not universally followed. *Monteiro,* 407 F.Supp.2d at 370–

71. Indeed, Mr. Nichols testified that he himself follows what he describes as a modified approach, which involves counting consecutively matching striae (CMS) to a proposed numeric threshold for identification. However, Mr. Nichols further testified that the explicit CMS criteria are not generally accepted because many firearms examiners consider them to be too stringent. The fact that Mr. Nichols applied CMS, which is not considered generally accepted, is not in itself a bar to his testimony because CMS is closely related to the traditional AFTE practice of pattern matching and appears to differ significantly only in that it is a more rigorous and more objective standard. As one district court put it, "It is enough to state that CMS is not a new technique, nor in conflict with the traditional pattern matching that has characterized the discipline from the earliest of times. It is simply an extension, a manner of describing the pattern that is believed to be more concise [and] more easily understood ...." *United States v. Diaz,* No. CR 05–167, 2007 WL 485967, at *12 (N.D.Cal. Feb. 12, 2007). In any case, it does appear that the use of "pattern matching" to determine whether or not there is a match, an approach which, in one form or another, underlies both AFTE and CMS, is generally accepted among firearms examiners in the field.

(f) Additional Problem

One additional problem with firearms examination, not necessarily neatly encapsulated by any one of the *Daubert* factors, bears mentioning. Generally, as was done in this case, the examiner is handed only one suspect weapon and the recovered projectile or projectiles. As one district court has pointed out, this method of testing is, "in effect, an evidentiary 'show-up,' not what scientists would regard as a 'blind test.'" *Green,* 405 F.Supp.2d at 107–108. Indeed, Defendant made the state-

ment in his brief, left unrefuted by the Government's written argument and by Mr. Nichols in his testimony, that "neither the firearm community, specifically, nor the forensic science community, generally, have ever conducted double-blind independent proficiency tests aimed at determining the accuracy (or inaccuracy) of firearm examiners." Deft. Brf. [Doc. 277] at 56 (citing Alfred Biasotti & John Murdoch, 3 *Modern Scientific Evidence* 143, 217–18 (David L. Faigman *et al.* eds. 1997)). The problem with this practice is the same kind of problem that has troubled courts with respect to show-up identifications of people: it creates a potentially significant "observer effect" whereby the examiner knows that he is testing a suspect weapon and may be predisposed to find a match.

## III. Recent Case Law

The above discussion is intended to show that, while there is a method underlying firearms identification evidence, and while that method has long been accepted both by the forensic science community and by courts, several significant criticisms have been levied against the field. These criticisms are serious enough that Mr. Nichols himself has felt compelled to defend his craft in writing. They are also serious enough that courts have increasingly paid attention to them. In a 2008 case in the Southern District of New York, *United States v. Glynn*, 578 F.Supp.2d 567 (S.D.N.Y.2008), the court noted that "recently, three federal judges have addressed the scientific status *vel non* of ballistics identification testimony, and all three have concluded that, in one respect or another, it does not have sufficient rigor to be received as science." *United States v. Glynn*, 578 F.Supp.2d 567, 570 (S.D.N.Y. 2008) (referring to *United States v. Diaz*, 2007 WL 485967 (N.D.Cal.2007), *United States v. Monteiro*, 407 F.Supp.2d 351 (D.Mass.2006), and *United States v. Green*, 405 F.Supp.2d 104, 114 (D.Mass.2005)).

The judge in *Glynn*, Judge Rakoff, proceeded to reach the same conclusion.

Judge Rakoff resolved the problem by sending the case back for retrial and ordering that "the ballistics opinions offered at the ... retrial may be stated in terms of 'more likely than not,' but nothing more. Similarly, in *United States v. Diaz*, Judge Alsup allowed the firearms identification expert testimony, but ordered that "[t]he experts may not ... testify to their conclusions 'to the exclusion of all other firearms in the world." They may only testify that a particular bullet or cartridge case was fired from a firearm to a 'reasonable degree of certainty in the ballistics field.'" 2007 WL 485967, at *14. In *Monteiro*, Judge Saris found that "[t]he lack of a universal standard for declaring a match is troubling but not fatal under *Daubert/Kumho* because a court may admit well-founded testimony based on specialized training and experience." 407 F.Supp.2d at 371. She went on to hold that "the expert may testify that the cartridge cases were fired from a particular firearm to a reasonable degree of ballistic certainty. However, the expert may not testify that there is a match to an exact statistical certainty." *Id.* at 375. In *Green*, Judge Gertner held, "[W]hile I will allow [the firearms expert] to testify as to his observations, I will not allow him to conclude that the match he found by dint of the specific methodology he used permits 'the exclusion of all other guns' as the source of the shell casings." 405 F.Supp.2d at 124.

## CONCLUSION

This Court adopts the reasoning of the courts in *Green, Monteiro, Diaz,* and *Glynn.* The evidence before the Court indicates that when a bullet is fired from a gun, the gun will impart to the bullet a set of markings that is, at least to some de-

1180

gree, unique to that gun. The evidence further indicates that an experienced firearms examiner can make observations of those markings, using a method that has been peer-reviewed, that allow him, in some cases, to form an opinion that a particular bullet was or was not fired from a particular gun. The Court therefore concludes that the firearms identification testimony is admissible under Rule 702 and *Daubert.* Accordingly, Mr. Nichols will be permitted to give to the jury his expert opinion that there is a match between the .30–.30 caliber rifle recovered from the abandoned house and the bullet believed to have killed Mr. Chunn. However, because of the limitations on the reliability of firearms identification evidence discussed above, Mr. Nichols will not be permitted to testify that his methodology allows him to reach this conclusion as a matter of scientific certainty. Mr. Nichols also will not be allowed to testify that he can conclude that there is a match to the exclusion, either practical or absolute, of all other guns. He may only testify that, in his opinion, the bullet came from the suspect rifle to within a reasonable degree of certainty in the firearms examination field.

In sum, the Court finds that the proffered expert opinion testimony with respect to firearms identification is admissible under Rule 702 and *Daubert.* However, the Court will impose limitations on that testimony, as described in this Memorandum Opinion and Order. **THEREFORE,** Defendant's Motion to Exclude Firearms Identification Evidence [Doc. 277] is hereby **DENIED** and Mr. Nichols shall be permitted to give expert testimony subject to the above-described limitations.