KITCHENS, JUSTICE,
CONCURRING IN PART AND IN RESULT:
¶40. While I agree with Justice Coleman’s decision that this case must be reversed and remanded due to the improper supplemental jury instruction, I disagree with its conclusion that trial counsel’s failure to object to the conclusory testimony of the State’s firearms identification expert can be deemed trial strategy. Brian Mcln-tire testified that the firearm in Willie’s possession matched the projectiles and fragments in evidence. Mclntire rendered these opinions in absolute terms, instead of to a reasonable degree of certainty in the field, as required by this Court’s precedent. Because Mclntire’s testimony was the sole evidence linking Willie with Tom Schlender’s murder, the failure to object was highly prejudicial. I would hold that trial counsel’s failure to object to the con-clusory nature of Mclntire’s firearm identification testimony constituted deficient performance that prejudiced Willie, violating his federal, and state constitutional rights to the effective assistance of counsel. Therefore, I respectfully concur in part and in the result.
¶ 41. The United States Constitution and the Mississippi Constitution provide that a defendant has a right to the effective assistance of counsel. U.S. Const. Amends. VI, *1283 XIV; Miss. Const. Art. 3, § 26; Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To succeed on a claim of ineffective assistance of counsel, the defendant must show that counsel’s performance was deficient, and that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
¶ 42. The defendant bears the burden to show that counsel’s performance was .deficient because it “fell below an objective standard of reasonableness.” Id. at 688, 104 S.Ct. 2052. A strong presumption exists that counsel’s performance fell “within a wide range of reasonable professional assistance.” Id. at 689, 104 S.Ct. 2052. Counsel’s performance must have been reasonable considering the totality of the circumstances. Id. at 688, 104 S.Ct. 2052.
¶ 43. The defendant also must show that counsel’s error adversely affected the defense. Id. at 692, 104 S.Ct. 2052. However, the defendant need not show that the error more likely than not changed the outcome of the case. Id. at 693,104 S.Ct. 2052. To show prejudice, “[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 694, 104 S.Ct. 2052.
¶ 44. As a preliminary matter, I observe that this Court has held that claims of ineffective assistance of counsel generally should be raised during post-conviction proceedings. But we may address a claim of ineffective assistance of counsel on direct appeal if the issues presented are based on facts fully apparent from the record. M.R.A.P. 22(b); Archer v. State, 986 So.2d 951, 955 (Miss. 2008). “[W]e ‘may nevertheless reach the merits of the ineffectiveness issue where .. ■. the record affirmatively shows ineffectiveness of constitutional dimensions_’” Taylor v. State, 167 So.3d 1143, 1146 (Miss. 2015) (quoting Read v. State, 430 So.2d 832, 841 (Miss. 1983)). In this case, the issue of whether Willie’s counsel should have objected to Mclntire’s conclusory testimony is fully apparent from the record. That is because, in this instance, the Court can determine whether counsel rendered ineffective assistance by applying the law to the facts in the record, and no information outside the appellate record is necessary to make this determination.
¶ 45. I now address whether Willie has shown that trial counsel’s failure to object to Brian Mclntire’s conclusory testimony was deficient performance. Mclntire’s exact testimony, in response to questioning on direct examination, that various shell casings, bullets, and fragments admitted into evidence had been fired in the handgun recovered from Willie, is informative in this regard.
¶ 46. With respect to the first of the four shell casings found on 1-55, Mclntire rendered the following testimony:
Q. And were you able to form an expert opinion as far as that shell casing compared to that gun?
A. I did.
Q. And what is your expert opinion?
A. The shell casing that is in State’s Exhibit 25 was fired in the gun that is in State’s Exhibit 43.
¶ 47. Regarding the second shell casing found on 1-55, Mclntire testified:
Q. And what is your expert opinion?
A, The shell casing that’s in State’s Exhibit 24 was fired in the gun in State’s Exhibit 43.
¶48. Mclntire testified as follows regarding the third shell casing from 1-55:
*1284 Q. What is your expert opinion, please?
A. The cartridge case in State’s Exhibit 29 was fired in the gun in State’s Exhibit 43.
¶49. And, regarding the'fourth shell casing found on 1-55, Mclntire testified:
Q. And what is your expert opinion? A. The casing that is in State’s Exhibit 30 was fired in the gun in State’s Exhibit 43.
Q. So all four shell casings that were recovered on Interstate 55 were fired from that gun?
A. That’s correct.
¶50. Mclntire also gave his opinion about the shell casings recovered in Tunica County:
Q. And the two shell casings that were recovered in Tunica County were fired from that gun?
.A. That is correct.
¶ 51. Next, the prosecutor asked Mcln-tire about projectiles and fragments recovered from the victim’s truck. Regarding a projectile collected from a rubber door seal inside the front driver’s door, Mclntire testified as follows:
Q. Okay. And were you asked to compare that item of evidence to this particular firearm?
A. I was.
Q. And were you able to form any kind of expert opinion as to whether or not that was fired from that particular gun?
A. Yes, sir.
Q. Okay. And what is your opinion?
A. The projectile that is in State’s Exhibit 38 was fired in the gun in State’s Exhibit 43.
Q. Okay. So this bullet recovered from inside the vehicle was fired in that gun?
A, That’s correct.
¶ 52, Regarding a group of projectile fragments collected from inside the driver’s-side rear door of the truck, Mclntire testified as follows:
A.,.. The copper jacket fragments that were marked as 6E and 6F, both of those were fired in the gun in State’s Exhibit 43,
The—so we’ve got G and H left. .,, The one that was labeled 6H, it was a copper jacket' fragment and I was able to say that it beared [sic] the same class characteristics as the firearm in State’s Exhibit 43 but I was not able to positively identify that one- fragment as being fired in State’s Exhibit 48.
¶53. Regarding a copper jacket fragment found on the floor of the truck, Mclntire gave the following testimony:
Q. And were you able to form an expert opinion?
[[Image here]]
A. The copper jacket fragment that is in State’s Exhibit 42 bears class characteristics consistent with the firearm in State’s Exhibit 43.1 could not positively identify it and—I could not positively include or exclude it as being fired in State’s Exhibit 43 due to its mutilated . condition.and the lack of individual characteristics.
¶ 54. Mclntire also rendered expert opinions about two projectiles collected by the medical examiner, stating: .
Q. The last line of the medical examiner’s label lists-this as a bullet from right shoulder.
[[Image here]]
Q. And do you have an expert opinion as far as that exhibit is concerned?
[[Image here]]
A. The projectile that is in State’s Exhibit 62 was fired in the gun in State’s Exhibit 43,
*1285 Q. So the bullet found in Mr. Schlen-der’s right shoulder was fired in that gun?
A. That’s correct.
[[Image here]]
Q. All right. I’m going to finally hand you—which has crime lab 11, State’s Exhibit 58. Okay. Where does that indicate that it came from?
A. The medical examiner’s label lists the last line as a bullet from body bag.
[[Image here]]
Q. And do you have an expert opinion as far as that exhibit is concerned?
A. I do.
Q. And what is that expert opinion?
' A. The bullet that is in State’s Exhibit 53 was fired from the gun in State’s Exhibit 43.
¶ 55. Then, the prosecutor embarked upon a final line of questioning that presented to the jury a summation of Mcln-tire’s expert opinions as follows:
Q. Brian, I know you—we’ve done a lot of asking questions and you’ve done a lot of answering questions. And just so we can clear this up for the jury, did you examine the gun that was located in Tunica County?
A. I did.
Q. And did you compare that gun to these two shell casings that were recovered in Tunica County?
A. I did.
Q. Did these two shell casings match this gun?
A. Yes, sir. Those two shell casings were fired from that gun.
Q. Were you asked to compare the four shell casings that were recovered on Interstate 55 to this gun that was recovered from James Willie in Tunica County?
A. I was.
Q. And were the four shell casings that were recovered on Interstate 55 shot from the gun recovered from James Willie?
A. The four shell casings were fired from that gun.
Q. And were the items—not all of them, but the majority of the items that were recovered from inside Tom Schlen-der’s truck that was found on Interstate 55 fired from the gun that was recovered from James Willie?
A. Two of the projectiles that were recovered from the truck were fired from the gun; and the fragments beared [sic] class characteristics with the gun.
Q. And was [sic] exhibits that were recovered from the body of Tom Schlen-der.during the postmortem examination fired from the gun belonging—or recovered from James Willie?
A, The metal fragment had no comparison value, but the other two projectiles that were submitted from autopsy were fired from the gun in State’s Exhibit 43.
. ¶ 56. The above testimony shows that the prosecutor elicited from Mclntire numerous opinions in absolute terms that the projectiles and fragments in evidence matched the gun found in Willie’s possession. Then, in a summary and highly con-clusory manner, the prosecutor and the witness reiterated the same testimony. Throughout all of this testimony, Willie’s counsel remained silent.. Counsel’s failure to object reflects a failure to recognize that this Court has placed limitations upon the level of certainty that experts may ascribe to their opinions.
¶57. This Court has held that, in civil cases, an expert witness’s opinion must be stated to a reasonable degree of probability in the witness’s field of expertise. Univ. of Miss. Med. Ctr. v. Lanier, 97 So.3d *1286 1197, 1203 (Miss. 2012). In civil cases, the plaintiff bears the burden of proof by the preponderance of the evidence, so expert opinions must be stated to a reasonable degree of probability. See id. But in criminal cases, because the burden of proof is much higher, “the opinion of an expert witness must be stated with reasonable certainty, given the state of knowledge in the field in which the expert is qualified.” Parvin v. State, 113 So.3d 1243, 1247 (Miss. 2013) (quoting West v. State, 553 So.2d 8, 20 (Miss. 1989) (emphasis added)). Mclntire testified in absolute terms, not to a reasonable degree of certainty in his field of expertise, that the bullets and shell casings matched the pistol Willie admitted having had in his possession at the time of Schlender’s murder. Given this Court’s limitations on the level of certainty that experts may ascribe to their opinions and the current state of the law concerning firearm identification testimony, counsel’s failure to object to Mclntire’s conclusory testimony was deficient performance.
¶ 58. Other courts have recognized that, due to limitations inherent in the field of firearm identification, an expert cannot reliably testify in absolute terms that a bullet was fired from a specific firearm. In United States v. Taylor, 663 F.Supp.2d 1170, 1171 (D. N.M. 2009), the defendant moved to exclude expert testimony that the bullet that killed the victim was fired in Taylor’s rifle. Taylor argued that the methodology used by the firearms examiner [1] was inadmissible under Rule 702. Id. at 1175. The district court found that “serious criticisms” of the methodology by commentators warranted the court’s careful examination of the reliability of the methodology using the factors from Daubert. Id. The court found that the methods could be tested and reproduced to some degree, and that the industry published a peer-reviewed journal. Id. at 1176. The court recognized that, “because the process is so subjective and qualitative, it ⅛ not possible to calculate an absolute error rate for routine casework.’” Id. at 1177 (quoting United States v. Monteiro, 407 F.Supp.2d 351, 366 (D. Mass. 2006)). Nonetheless, the court found that reports of proficiency testing suggested that the error rate was quite low. Id. The court found that the methodology of pattern matching to determine whether there is a match was generally accepted in the field of firearms examination. Id. at 1178.
¶ 59. But, because the process of determining that a match exists is subjective, the court found deficiency in the standards controlling the technique’s operation. The court explained:
Arguably the biggest obstacle facing any firearms examiner is that there is no such thing as a “perfect match.” Even two bullets known to have been fired consecutively from the same gun will display some differences. See Alfred A. Biasotti, A Statistical Study of the Individual Characteristics of Fired Bullets, 4 Forensic Sci. 34, 44 (1959). Even more problematic, bullets fired from different guns may have significantly similar markings, reflecting class or sub-class, rather than individual, characteristics. The practice in the field, therefore, as embodied in the [Association of Firearm and Toolmark Examiners (AFTE) ] Theory of Identification, calls on examiners to declare an identification only “when the unique surface contours of two tool-marks are in ‘sufficient agreement.’ ”
*1287 Id. at 1177. The district court further explained that:
The AFTE Theory, thus, does not provide any uniform numerical standard examiners can use to determine whether or not there is a match and, indeed, Mr. Nichols indicated in his testimony that most AFT examiners do not. use any numerical standard. Instead, the AFTE theory is circular. An examiner may make an identification when there is sufficient agreement, and sufficient agreement is defined as enough agreement for an identification. See Monteiro, 407 F.Supp.2d at 370. The conclusion that there is a match between a recovered bullet and a particular gun is, therefore, necessarily a subjective one, “... held in the mind’s eye of the examiner and ... based largely on training and experience in observing the difference between known matching and known non-matching impression toolmarks.” Monteiro, 407 F.Supp.2d at 362-63 [internal quotation omitted].

Id.

¶ 60. The district court identified an additional relevant factor. The court observed that, because the firearm examiner usually is provided only one suspect weapon and recovered projectiles, what occurs is basically an evidentiary “show-up,” not a blind test. Id. at 1178. The court stated that “[t]he problem with this practice is the same kind of'problem that has troubled courts with respect to show-up identifications of people: it creates a potentially significant ‘observer effect’ whereby the examiner knows that he is testing a suspect weapon and may be predisposed to find a match.” Id. at 1179. ..
¶ 61. The district court in Massachusetts concluded that an experienced firearms examiner using peer-reviewed methods could testify that a bullet was or was not fired from a particular firearm. Id. at 1180. But, due to limitations on reliability, a firearms expert would not be allowed to testify that “that he can conclude that there is a match to the exclusion, either practical or absolute, of all other guns. He may only testify that, in his opinion, the bullet came from the suspect rifle to within a reasonable degree of certainty in the firearms examination field.” Id.
, ¶ 62. Similar conclusions were reached restricting a firearm and toolmark examiner from making conclusory statements in United States v. Glynn, 578 F.Supp.2d 667 (S.D.N.Y. 2008), United States v. Monteiro, 407 F.Supp.2d 361 (D. Mass. 2006), United States v. Green, 405 F.Supp.2d 104 (D. Mass. 2005), and Commonwealth v. Pytou Heang, 458 Mass. 827, 942 N.E.2d 927, 942 (2011).The district court in Glynn found that, due to the subjectivity inherent in the methodology, allowing a firearms examiner to testify to an absolute match posed a serious danger of misleading the jury “as to the nature of the expertise involved.” Glynn, 578 F.Supp.2d at 574. The court limited firearms examiners to testifying that a match was “more likely than not.” Id. The court in Monteiro concluded that:
Because an examiner’s bottom line opinion as to an identification is largely a subjective one, there is no reliable statistical or scientific methodology which will currently permit the expert to testify that it is a “match” to an absolute certainty, or to an arbitrary degree of statistical certainty. Allowing the firearms examiner to testify to a reasonable degree of ballistic certainty permits the expert to offer her findings, but does not allow her to say more than is currently justified by the prevailing methodology.
Monteiro, 407 F.Supp.2d at 372 (citation omitted). And in Green, the court found that an opinion that firearms examination methodology revealed a match between a *1288 firearm and shell casings “to the exclusion of all other guns” was unreliable under Rule 702. Green, 405 F.Supp.2d at 124; see also United States v. Willock, 696 F.Supp.2d 536, 546 (D. Md. 2010) (holding that toolmarks examiners must be limited in the degree of certainty to which opinions are expressed).
¶63. In addition to these cases calling conclusory firearm identification testimony into question, this issue has arisen in this Court. This Court had before it an attack on the certainty of an expert’s conclusion that two distinct groups of bullets were fired in the same gun in Manning v. State, 119 So.3d 293 (Miss. 2013). At Manning’s trial, an FBI firearms examiner testified that a bullet found at the crime scene and two bullets found in the body of a victim matched two bullets taken from a tree at Manning’s mother’s house “to the exclusion of every other firearm in the world.” Manning v. State, 726 So.2d 1152, 1181 (Miss. 1998). In that direct appeal this Court had rejected Manning’s argument that this testimony was prejudicial. Id. One day prior to Manning’s scheduled execution, the United States Department of Justice released a letter admitting that the firearm identification testimony was erroneous. Manning submitted the letter with his motion to set aside his convictions and for other relief. The letter stated the following:
The science regarding firearms examinations does not permit examiner testimony that a specific gun fired a specific bullet to the exclusion of all other guns in the world. The examiner could testify •.to that information, to a reasonable degree of scientific certainty, but not absolutely. Any individual association or identification conclusion effected through this examination process is not based on absolute certainty but rather a reasonable degree of scientific certainty. As with any process involving human judgment, claims of infallibility or impossibility of error are not supported by scientific standards.
Ex. E to Supplement to Motion to Stay Execution and Set Aside Convictions, Second Motion for Leave to File Successive Petition for Post-Conviction Relief, And Motion in the Alternative for Other Forms of Relief, Manning v. State, No. 2013-DR-00491-SCT. ¶64. The letter also stated that “we are notifying the governor’s office, attorney general’s office, and the defense, as well as the Innocence Project and the National Association of Criminal Defense Lawyers of the errors.” Id. This Court denied Manning’s request for hearings on the reliability of expert' testimony on firearms identification, but granted other relief to Manning, including staying his execution." Manning v. State, 119 So.3d 293 (Miss. 2013); Manning v. State, 112 So.3d 1082 (Miss. 2013). The order in Manning was handed down and published approximately one year before Willie’s trial. Manning, 119 So.3d at 293. ¶65. The record establishes that Willie’s trial counsel failed to recognize that, in criminal cases, expert opinions must be stated to a reasonable degree of certainty in -the expert’s field of expertise. Parvin, 113 So.3d at 1247 (quoting West, 553 So.2d at 20). Willie’s trial counsel also failed to recognize this Court’s order in Manning and the case law holding that firearms and toolmark identification testimony is properly limited under Rule 702 to the expert’s declaring a match to a reasonable degree of certainty in the firearms and toolmark identification field, not to an absolute certainty.-
¶ 66. Mclntire’s expert opinions" were stated in terms of absolute certainty, not in terms of a reasonable degree of certainty in the afield of firearms identification. Melntire testified that the final step in his examination was to view a bullet or shell casing known to have been fired, from a *1289 pistol linked to Willie and a bullet or shell casing found at the crime scene. Mclntire visually observed the known and questioned items simultaneously with the aid of a comparison microscope, a magnification device which allowed Mclntire to see both items, microscopically, at the same time. Thus, Mclntire’s ultimate opinion was reached in a subjective manner by looking at two objects, albeit with trained and practiced eyes, in order to decide whether they resembled each other enough, in his opinion, to have been fired in the same firearm. Herein lies the subjectivity weakness that the other courts have found in the firearm identification methodology employed by Mclntire and others in his field.
¶ 67. The prosecutor did not frame his questions properly, i.e., to a reasonable degree of certainty in the field of firearm identification, and the witness did not so qualify his opinions. Considering the totality of the circumstances, no conceivable trial strategy could have been served by defense counsel’s failure to object to Mcln-tire’s conclusory testimony. An objection would have given the trial court the opportunity to limit Mclntire’s conclusions to a reasonable degree of certainty in the firearms examination field. See Parvin, 113 So.3d at 1247 (quoting West, 553 So.2d at 20). This would have required much more critical jury assessment of the only evidence connecting Willie to the crime in this circumstantial evidence case.’ Without such limitation, the jury was free to deem Mclntire’s ■ conclusions absolute. The jury was left to believe that Mclntire’s expert opinions, thus expressed, were' factually correct beyond all doubt. “[A] certain patina attaches to [expert] testimony, running the risk that the jury, labeling it ‘scientific,’ will give it more credence than it deserves.” United States v. Green, 405 F.Supp.2d 104, 117 (D. Mass. 2005). I would hold that trial counsel’s failure to object pretrial and contemporaneously was constitutionally deficient performance.
¶ 68. Further, I would hold that counsel’s failure to object was prejudicial to Willie because “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. The State’s entire case rested on Mclntire’s testimony that the bullets and shell casings found at the crime scene by the medical examiner and those recovered in Tunica County were fired from the gun that Willie admitted had been in his possession at the time of the crime. Only the firearm identification testimony linked Willie with the crime; there was no eyewitness testimony, no DNA evidence, no fingerprint evidence, no evidence of motive, and no confession. The trial court recognized that the State’s evidence was entirely circumstantial by granting a circumstantial evidence instruction stating that the State had to prove every element of deliberate design murder beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence.
¶ 69. Defense counsel did choose to ask Mclntire -about his margin of error on cross-examination and thereby elicited the answer that Mclntire was not infallible. Such brief and vague testimony was not likely to have had much impact upon the weight of Mclntire’s many unqualified conclusions that the bullets and shell casings collected by investigating officers matched Willie’s pistol. But had counsel objected and had the trial court properly limited Mclntire’s conclusions to a reasonable degree of certainty in the field, the impact of the sole evidence against Willie would have been reduced significantly, especially if followed by effective argument- on this all-important topic. The jurors would not have been exposed to purportedly • scientific *1290 opinions that there was an absolutely definite match between Willie’s gun and the bullets and shell casings associated with Schlender’s murder. It is well known that “juries usually place greater weight on the testimony of an expert witness than that of a lay witness.” Edmonds v. State, 955 So.2d 787, 792 (Miss. 2007). Counsel’s failure to object erodes confidence in the outcome of Willie’s trial. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
¶ 70.1 would hold that Willie was denied his constitutionally guaranteed right to the effective assistance of counsel. U.S. Const. Amend. VI; U.S. Const. Amend. XIV; Miss. Const. Art. 3, § 26. Therefore, while I agree that this case must be reversed and remanded due to the improper supplemental jury instruction, I would find that additional reversible error occurred because Willie received constitutionally ineffective assistance of counsel.
KING, J., JOINS THIS OPINION.