COMMONWEALTH *vs.* PYTOU HEANG.

Essex. October 8, 2010. - February 15, 2011.

Present: IRELAND, SPINA, BOTSFORD, & GANTS, JJ.

*Homicide. Firearms. Evidence,* Firearm, Identification, Scientific test, Expert opinion, Relevancy and materiality, Admissions and confessions, Hearsay, Photograph, Authentication. *Practice, Criminal,* Assistance of counsel, Admissions and confessions, Voir dire, Deliberation of jury, Capital case. *Constitutional Law,* Assistance of counsel, Admissions and confessions, Confrontation of witnesses. *Jury and Jurors.*

The evidence at a criminal trial was more than sufficient to permit a rational jury to conclude beyond a reasonable doubt that the defendant knowingly participated in an armed home robbery and two murders, on theories of both deliberate premeditation and felony-murder, and was knowingly in sole or joint illegal possession of a firearm. [835-836]

Discussion of forensic ballistics evidence. [836-843]

At a murder trial, the judge did not abuse his discretion in admitting in evidence expert forensic ballistics testimony by a State trooper identifying a particular firearm as the one used in the shootings, or in denying the defendant's request for a hearing regarding the admissibility of this testimony, where such evidence has long been deemed admissible by this court, and where the judge had a reasonable basis to conclude that the expert testimony could assist the jury in determining whether any of the weapons recovered by police were used in the shootings [843-845]; further, there was no abuse of discretion in the condition imposed by the judge on the admission of the testimony on direct examination (i.e., requiring the expert to inform the jury of the limitations of his opinion) [845-846], and, considering the entirety of the expert's testimony, no prejudicial error arose from the expert's testimony on cross-examination and redirect examination that lacked the limitations imposed by the judge on direct examination [846].

This court concluded that, where defense counsel at a criminal trial is furnished in discovery with the documentation needed to prepare an effective cross-examination, where a jury are provided with the necessary background regarding the theory and methodology of forensic ballistics, and where an opinion matching a particular firearm to recovered projectiles or cartridge casings is limited to a "reasonable degree of ballistic certainty," a jury will be assisted in reaching a verdict by having the benefit of the opinion, as well as the information needed to evaluate the limitations of such an opinion and the weight it deserves. [846-850]

At a murder trial, the judge did not abuse his discretion in admitting in evidence, over the defendant's objection, expert testimony and opinion based on the results of gunshot residue testing, where the evidence was relevant

to a contested issue, although not conclusive of it; and where the probative value of the evidence was not substantially outweighed by its prejudicial effect. [850-852]

At a criminal trial, no substantial risk of a miscarriage of justice arose from the admission in evidence of the defendant's invocation of his right to counsel and his right to remain silent during a police interview, where the evidence was admitted because of the defendant's understandable tactical decision to have the entire recorded interview heard by the jury. [852-853]

In the circumstances of a criminal case, and in the absence of an objection by the defendant, the trial judge did not err in admitting in evidence the defendant's denials and the hearsay accusatory statements of the police that triggered those denials. [853]

At a murder trial, the judge did not err by admitting in evidence, over the defendant's objection, two statements made by a codefendant who did not testify at trial and who was not subject to cross-examination, where the testimony was not offered for the truth of the matter asserted. [853-855]

A trial judge did not err in admitting in evidence a videotape that was properly authenticated. [855-856]

At a murder trial, the judge prudently and reasonably conducted, over defense objection, an individual voir dire of prospective jurors about their ability to remain impartial if gang-related testimony were admitted at trial, and there was no merit to the defendant's contention that the questioning prejudiced or otherwise tainted the jury. [856-857]

There was no merit to a criminal defendant's argument that a postverdict letter sent from a juror to the judge indicated that the defendant was denied a fair trial. [857-859]

INDICTMENTS found and returned in the Superior Court Department on September 7, 2005.

The cases were tried before *Richard E. Welch, III,* J.

*James E. Methe* for the defendant.

*Catherine L. Semel,* Assistant District Attorney, for the Commonwealth.

GANTS, J. A jury in the Superior Court convicted the defendant on two indictments charging murder in the first degree on theories of deliberate premeditation and felony-murder for the shooting deaths of Amy Dumas and Robert Finnerty. The defendant was also convicted of armed home invasion and unlawfully carrying a firearm.[1] On appeal, the defendant argues that he should be granted a new trial because the trial judge erred by improperly admitting in evidence: (1) expert forensic ballistics

---

[1] The defendant was sentenced to two consecutive life terms on the murder convictions, and to from four to five years to be served concurrently on the firearm conviction. The armed home invasion conviction was placed on file with the consent of the defendant and is not part of the appeal.

testimony identifying a particular firearm as the one used in the shootings; (2) expert testimony regarding gunshot residue testing; (3) statements made by the defendant to police denying he committed the crime and requesting legal counsel; (4) two statements made by one of the codefendants; and (5) a videotape of security camera footage from a store. In addition, the defendant challenges the judge's individual voir dire of prospective jurors during jury selection and contends that a letter from a juror sent to the judge after the verdicts were returned indicates that the defendant was denied a fair trial. Finally, the defendant argues that the evidence presented at trial was insufficient to support the jury's verdicts and that we should reverse the judge's denial of the defendant's motion for required findings of not guilty. We conclude that the judge's rulings were either not error or not prejudicial error, and that the evidence was sufficient to sustain the convictions. Accordingly, we affirm the defendant's convictions. After a complete review of the record, we also conclude that there is no basis to exercise our power under G. L. c. 278, § 33E, to reduce his murder convictions to a lesser degree of guilt or to order a new trial.

1. *Background.* Because the defendant challenges the sufficiency of the evidence, we summarize the evidence in detail, considering it in the light most favorable to the Commonwealth and reserving certain details for our analysis of the other issues raised on appeal.

Shortly after 11 P.M. on Monday, May 16, 2005, Judith Finnerty, Robert Finnerty's wife,[2] answered a knock at the back door of the family's apartment at 58 Cottage Street in Lynn. She spoke with a young Asian man, later identified as Phap Buth,[3] who asked to buy marijuana.[4] Although she did not know his name at the time, Judith recognized Buth as someone to whom she had previously sold marijuana. She told him that the family no

---

[2]Robert Finnerty will be referred to as Robert and Judith Finnerty will be referred to as Judith or Judith Finnerty.

[3]Phap Buth is one of the codefendants in this case. He was tried separately and convicted on two indictments charging murder in the first degree and armed home invasion. He was given consecutive life sentences on the murder convictions.

[4]Judith and Robert had occasionally sold marijuana to "make ends meet" since 2003 when Robert was paralyzed by his third stroke and Judith quit her job to take care of him.

longer sold marijuana, but agreed to sell him a small amount nonetheless. Buth came into her apartment, purchased the marijuana, and left. Seconds after leaving, Buth knocked again on the door and asked to buy a second bag of marijuana. Judith cracked the door open and said, "No." Buth forced open the door and two other individuals in black ski masks, black hooded sweatshirts, and black gloves rushed into the apartment holding handguns.[5] Robert raised his walker and was shot once in the chest. Amy Dumas, the Finnertys' sixteen year old daughter,[6] came running out of her bedroom to help her father and was shot twice in the back. Judith, who had tried to flee from the intruders and had fallen to the floor, was not shot. Both Robert and Amy later died from their wounds. The intruders fled without saying or taking anything.

Lynn police arrived at 58 Cottage Street within minutes of the shootings. For reasons that are unclear from the record, two officers went directly to an apartment building at 17 Morris Street in Lynn, a short distance away from 58 Cottage Street. On arrival, they saw an Asian male wearing a black hooded sweatshirt and jeans, later identified as the defendant, walking toward the front of the building along a path from the back of the building. The police stopped and pat frisked him but found no weapons.[7] The defendant told the officers he had taken the bus from Revere to visit a friend named "Shaggy" who lived on the third floor at 17 Morris Street, but after knocking on the apartment door and receiving no answer, he was leaving to take the bus home. Judith Finnerty accompanied police to 58 Cottage Street to try to identify the defendant but she was unable to do so, and the defendant was released.

While the defendant was being detained and questioned, other officers entered 17 Morris Street through a door at the back of the building that was ajar and discovered an Asian male, later identified as Chon Son, on the third-floor landing.[8] Inside a

---

[5]Buth did not come inside with the gunmen.

[6]It is unclear from the record why Amy Dumas has a different surname from her parents.

[7]One of the officers present for the patfrisk testified that the defendant "had an accelerated heart rate." The other officer did not notice an elevated heart rate and described the defendant's demeanor as "[c]alm."

[8]Chon Son is one of the codefendants in this case. He pleaded guilty to two

black baseball hat on that landing, the police found a bandana, a sweatband, three black gloves, and an Intratec AB-10 nine millimeter handgun. Several feet away from the hat on the landing was a Cobra .380 caliber handgun and a "doo-rag" cap, as well as another bandana at the top of the stairs. A fourth black glove fell to the ground when Son was pat frisked for weapons.

The police arrested Son and brought him outside for Judith Finnerty to identify, but she was unable to make a positive identification. During his booking at the police station, police found a receipt from a Pet Express store dated earlier that day in Son's possession. The police seized Son's clothing as evidence, swabbed his hands to test for gunshot residue, and swabbed a stain on his neck to test for the presence of blood.

Around the same time that the defendant and Son were found at or near 17 Morris Street, police encountered Buth walking on Light Street, several hundred yards away. Buth gave his name and said he had just gotten off a bus from Revere and was going to visit a friend "David" who lived on the street, although he could not provide David's last name. Buth agreed to return with police to 17 Morris Street, where Judith Finnerty identified him as the individual who had come to her back door to buy marijuana and then forced open the door. The police arrested Buth and, at the police station, seized his clothes as evidence and swabbed his hands to test for gunshot residue.

The police also attempted to locate the defendant but were unable to do so until some time after 2:30 or 3 A.M., when officers, who were conducting a physical surveillance, spotted the defendant on the street near his residence at 116 Thornton Street in Revere. The defendant agreed to return to Lynn to speak with investigators and was interviewed at the Lynn police station at approximately 5 A.M.

In the interview, most of which was tape recorded and played at trial, the defendant stated that he drove to Lynn in his sister's automobile with a friend named "Codam" around 8 or 9 P.M., dropped him off somewhere in Lynn, drove back to Revere, and then took a bus back to Lynn.[9] Once back in Lynn, the defendant

---

indictments charging murder in the second degree, as well as armed home invasion and carrying a firearm without a license, and was sentenced to concurrent terms of life in prison on the murders.

[9]Phap Buth is known to acquaintances as both "Cory" and "Codam," and was frequently referred to as such during testimony.

said that he went to his friend "Pinkie's" apartment looking for marijuana. He then went to see another friend, "Shaggy," at Shaggy's apartment on the third floor of 17 Morris Street, but Shaggy did not answer when the defendant knocked on the door. The defendant said he then left the building and was immediately stopped by police when he went outside. The defendant claimed not to have seen anyone inside 17 Morris Street. The defendant also told investigators that he had been wearing black clothes and jeans that night.[10] The defendant was released after the interview concluded and remained free until his arrest on May 21, 2005.

In the weeks prior to the shooting, both the defendant and Son had been seen with handguns. One witness described the defendant's gun as being "bigger" than Son's gun.

One or two nights before the shooting, on either May 14 or May 15, the defendant and Buth visited the apartment of Eang Logn and his friend, Jacquelyn Cordes. Buth had a large bag of marijuana, and asked Cordes if she would contact a drug dealer and trade the marijuana for "crack" cocaine, which she did. After the trade, the defendant asked Logn to telephone another drug dealer, which Logn refused to do because Buth had already traded his marijuana and the defendant had little money. Logn asked the defendant why he wanted him to make the call when he had no money. The defendant gestured, putting his hands beneath the belt of his pants, to which Logn replied, "If you have a gun, I would not let you get into my house." The defendant did not say anything in response and left the house with Buth shortly thereafter.

At approximately 6 P.M. on May 16, the night of the shootings, the defendant drove Son, Son's sister, and Son's girl friend to a Pet Express store in Lynn, where Son bought fish and pet supplies.[11] After leaving the store, the defendant dropped off his passengers at Son's home in Saugus, but returned around 9 or 9:30 P.M., with Buth in the vehicle, to take Son and Son's girl

---

[10]During the interview with police, the defendant said that he had left a black hooded sweatshirt in his sister's vehicle, which was parked near the Thornton Street residence in Revere. When police seized the vehicle and searched it for evidence, they found a black jacket, but not a hooded sweatshirt.

[11]The Pet Express receipt found in Chon Son's possession at the Lynn police station was dated May 16 and time stamped 19:35 or 7:35 P.M.

friend to a fast food restaurant. After getting the food, the defendant and Buth dropped Son and his girl friend at Son's home. A short time later, Son's girl friend overheard a cellular telephone "walkie talkie" conversation where the defendant told Son to come outside, and Son left the house.

Also on the night of May 16, the defendant and Buth had arranged with an individual named Pany An, known as "Pinkie," to go to Lowell at 9 P.M., but neither the defendant nor Buth showed up. Around midnight, the defendant came by An's apartment, which was near Morris and Cottage Streets in Lynn, looking scared and nervous. The defendant told An that his vehicle was parked in the area but he could not go to it because of the heavy police presence in the area. The defendant stayed for several hours in An's apartment and left after receiving a telephone call from his mother saying the police were at his house in Revere looking for him.

On the afternoon of May 17, after being questioned by the Lynn police and released, the defendant saw Son's girl friend, who had read about the shootings, and who asked the defendant what had happened. The defendant said that he, Son, and Buth had gone to 58 Cottage Street because Buth had wanted to buy some marijuana, and that a father and daughter had been shot. When Son's girl friend asked the defendant why they did it, the defendant, who had been looking at her, turned and looked away.

Lynn Schneeweis, a chemist with the State police deoxyribonucleic acid (DNA) unit, compared known DNA samples taken from the defendant, Chon Son, Phap Buth, Amy Dumas, and Robert Finnerty with samples taken from various items of clothing seized at 17 Morris Street. Although the DNA profiles on all the items of clothing were determined to be mixtures from at least two or more individuals, Schneeweis identified the defendant as a potential contributor to five of the items, Son as a potential contributor to six items, and Buth as a potential contributor to one item. In particular, Schneeweis identified the defendant as a potential contributor of the DNA mixtures found on the sweatband, the doo-rag cap, the bandana, and two gloves found inside the baseball hat. Regarding the gloves, Schneeweis testified that the defendant's DNA profile matched the primary DNA profile found on the items, and that the probability of another randomly

selected individual besides the defendant having the same DNA
profile was approximately one in 178.9 quadrillion of the
Caucasian population, one in 18.8 quadrillion of the African-
American population, and one in 77.1 quadrillion of the Hispanic
population.[12] Schneeweis also testified that the defendant was a
potential contributor to the DNA mixture on the sweatband, and
that the probability of a randomly selected individual having
contributed to this mixture was approximately one in 546,100 of
the Caucasian population, one in 1.4 million of the African-
American population, and one in 315,400 of the Hispanic
population.[13]

Elana Foster, the forensic science department manager at a
private testing company retained by the prosecution, testified
that "unique particles" from gunshot residue were found on all
four gloves seized at 17 Morris Street, as well as on the right
hand sleeves or cuffs of clothes seized from the defendant,
Buth, and Son.[14] Foster testified that the persons wearing these
clothes had either discharged a firearm, been near a discharged

---

[12]There was significant testimony regarding the decision by the prosecution
not to use an Asian-American database in calculating these "matching"
estimates given the defendant's Cambodian ancestry. Both Schneeweis and the
defense expert testified that using databases from different ethnic and geographic
populations will yield varying estimates regarding a deoxyribonucleic acid
(DNA) profile "match." Schneeweis testified that the Caucasian, African-
American, and Hispanic databases were the standard databases used in her
industry to provide a general likelihood of a profile match, and that other
databases typically provided estimates within a factor of ten of those estimates.
The defense expert testified that, although an Asian-American or Cambodian
database would likely yield more accurate estimates, the results from the
Caucasian, African-American, and Hispanic databases would be "within
throwing distance of those numbers." Such variances are not statistically
meaningful when the probability of a random match, at the low end, is ap-
proximately one in 18.8 quadrillion.

[13]See note 12, supra.

[14]"Unique" particles from the discharge of firearms are formed when the
firing pin of a firearm hits the primer cap of an ammunition cartridge, igniting
the three main chemical elements in the primer compound, which in turn
ignites the gunpowder. These primer elements are lead, barium, and antimony,
and the firing process fuses some of these elements together into particles.
Gunshot residue experts look for particles with all three elements fused
together and consider these particles unique to the process of firing a weapon
because the only other common process that creates similar particles is setting
off fireworks. Particles from fireworks, however, tend to contain magnesium,
which particles from gunshot primer compounds do not.

firearm, or had come into contact with something that had gunshot residue on it.

A forensic ballistics and firearms identification expert, Trooper Brian Lombard of the State police firearms identification unit, testified that he compared the three nine millimeter projectiles and cartridge casings recovered at the scene of the shooting and during the autopsy of Amy Dumas with test firings from the Intratec AB-10 nine millimeter handgun found on the third-floor landing of 17 Morris Street. Based on those comparisons, Trooper Lombard stated that in his opinion all three cartridge casings and projectiles from the shootings had come from the Intratec handgun. Trooper Lombard also noted, however, that as a matter of science, he could not exclude every other nine millimeter weapon with similar barrel characteristics to the Intratec handgun.

2. *Sufficiency of the evidence.* The defendant challenges the judge's denial of his motions for required findings of not guilty at the close of the Commonwealth's case and at the close of all the evidence. In reviewing the sufficiency of the evidence, the "question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979). "A conviction may be based on circumstantial evidence alone, as long as that evidence is sufficient to find the defendant guilty beyond a reasonable doubt." *Commonwealth* v. *Platt*, 440 Mass. 396, 401 (2003).

Viewing the evidence in the light most favorable to the Commonwealth, we conclude that a rational jury could have found the defendant guilty of murder in the first degree on theories of deliberate premeditation and felony-murder, as well as guilty of armed home invasion and the illegal carrying of a firearm. There was strong eyewitness identification evidence that Buth used the ruse of a marijuana purchase to help the two armed and masked intruders invade the Finnerty home, where they assaulted Judith, and shot and killed Robert and their daughter. There was also strong evidence that the defendant, Son, and Buth were together shortly before the shootings, and they were

all found in close proximity to one another and to 58 Cottage Street shortly after the shootings. There was compelling forensic evidence tying Son and the defendant to the clothing found with the firearm used in the shooting. When considered together with the admissions made by the defendant after the shooting to Son's girl friend and his false and conflicting statements to police, a rational jury had more than sufficient evidence to conclude beyond a reasonable doubt that the defendant knowingly participated in the armed home invasion and the murders, on theories both of deliberate premeditation and felony-murder, and was knowingly in sole or joint illegal possession of a firearm.

3. *Admission of forensic ballistics or firearms identification evidence.* The defendant contends that the judge erred by admitting in evidence Trooper Lombard's expert opinion that the Intratec AB-10 handgun found at 17 Morris Street fired the projectiles and cartridge casings recovered from the scene of the shooting and from Dumas's body. The defendant further contends that the judge erred by denying his request for a *Daubert-Lanigan* hearing regarding the admissibility of this opinion. See *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994). The defendant raised these claims before trial through a motion in limine and again at trial, adequately preserving these issues for appeal.

Forensic ballistics or firearms identification "is the analysis of bullet and cartridge case evidence and the use of that evidence to link specimens to each other and to particular weapons." National Research Council, Ballistic Imaging 15 (2008) (Ballistic Imaging).[15] Forensic ballistics evidence has long been recognized as admissible in Massachusetts. See, e.g., *Commonwealth* v. *Barbosa*, 457 Mass. 773, 780 (2010); *Commonwealth* v. *Best*, 180 Mass. 492, 495-496 (1902). At least one source identifies the 1902 case of *Commonwealth* v. *Best, supra*, authored by Chief Justice Oliver Wendell Holmes, as being the

---

[15]Such evidence is commonly referred to as "ballistics" evidence. See, e.g., *Commonwealth* v. *Garvin*, 456 Mass. 778, 783, 798 (2010). The word "ballistics" literally means "the study of the dynamics of projectiles in flight." National Research Council, Ballistic Imaging 15 (2008) (Ballistic Imaging). The more precise term is either "forensic ballistics" or "firearms identification." *Id.*

first in the nation to uphold the admissibility of forensic ballistics evidence in the form of expert testimony and comparison photographs.[16] See 4 D.L. Faigman, M.J. Saks, J. Sanders, & E.K. Cheng, Modern Scientific Evidence: The Law and Science of Expert Testimony 652 (2009); *Commonwealth* v. *Best, supra.* Nevertheless, the accuracy and reliability of forensic ballistics evidence have recently been the focus of significant legal and scientific scrutiny. See Ballistic Imaging, *supra* at 1-87; National Research Council, Strengthening Forensic Science in the United States: A Path Forward 150-155 (2009) (Strengthening Forensic Science). See generally Schwartz, A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification, 6 Colum. Sci. & Tech. L. Rev. 1 (2005). Concerns about both the lack of a firm scientific basis for evaluating the reliability of forensic ballistics evidence and the subjective nature of forensic ballistics comparisons have prompted many courts to reexamine the admissibility of such evidence. See *United States* v. *Willock*, 696 F. Supp. 2d 536, 546-547, 555-574 (D. Md. 2010); *United States* v. *Taylor*, 663 F. Supp. 2d 1170, 1173-1180 (D. N.M. 2009); *United States* v. *Glynn*, 578 F. Supp. 2d 567, 568-575 (S.D.N.Y. 2008); United States *vs.* Diaz, U.S. Dist. Ct. No. CR 05-00167 WHA (N.D. Cal. Feb. 12, 2007); *United States* v. *Natson*, 469 F. Supp. 2d 1253, 1259-1262 (M.D. Ga. 2007); *United States* v. *Monteiro*, 407 F. Supp. 2d 351, 354-375 (D. Mass. 2006); *United States* v. *Green*, 405 F. Supp. 2d 104, 106-124 (D. Mass. 2005); *State* v. *Fleming*, 194 Md. App. 76, 97-109 (2010). See also Commonwealth *vs.* Meeks, SUCR2002-10961, SUCR2003-10575 (Sept. 27, 2006).

The theory underpinning forensic ballistics is that all firearms possess distinctive features that in turn impart distinctive mark-

---

[16]In *Commonwealth* v. *Best*, 180 Mass. 492, 495-496 (1902), this court held that comparison photographs of bullets recovered from a murder victim's body and a bullet "pushed through" a rifle found in the defendant's kitchen were properly admitted at trial. Chief Justice Holmes stated: "We see no other way in which the jury could have learned so intelligently how that gun barrel would have marked a lead bullet fired through it, a question of much importance to the case." *Id.* at 495. Likewise, Chief Justice Holmes concluded that expert testimony that the bullets recovered from the body were marked with rust the way they would have been if fired through the recovered rifle was properly admitted. See *id.* at 495-496.

ings or "toolmarks"[17] onto projectiles and cartridge casings when the weapon is fired. Using a microscope, firearms examiners compare toolmarks found on spent projectiles and cartridge casings to determine whether they were fired from a particular weapon, generally by comparing projectiles and cartridge casings found at the scene of a crime or in an autopsy with ones test-fired from a seized weapon.[18] See Strengthening Forensic Science, *supra* at 150-151; Ballistic Imaging, *supra* at 11-86; Theory of Identification as it Relates to Toolmarks, 30 AFTE J. 86, 86-88 (1998) (Theory of Identification I).

The various distinctive features of firearms are known among firearm examiners as "characteristics." See Strengthening Forensic Science, *supra* at 152; Ballistic Imaging, *supra* at 55-64. Firearm characteristics may arise in a variety of ways, including from the design of a firearm, from variations or imperfections in the manufacturing of a firearm, or from wear and tear of a firearm over time. See Ballistic Imaging, *supra* at 56-61. For example, the boring and rifling of a gun barrel create a series of spiraled ridges inside the barrel that are designed to spin the projectile as it leaves the gun, stabilizing the projectile in flight. These rifling ridges and their corresponding depressions are design features known as "lands" and "grooves," and they have either a right-handed or left-handed directional "twist." See *id.* at 31-32. The lands and grooves in turn impart "striations" or abrasion-type toolmarks onto projectiles as they are pushed out of the barrel, so firearms examiners commonly examine projectiles to determine the number of lands and grooves and the directional twist of the firearm that fired it. See *id.* at 45-46.

Gun barrels and rifling ridges may obtain other distinctive characteristics either during the machining process or after a firearm leaves the factory. These other characteristics may arise from the use of a particular machining tool or manufacturing technique, from random manufacturing imperfections, or from

---

[17]A "toolmark" refers to any mark left on an object by coming into contact with another, typically harder, object. See National Research Council, Strengthening Forensic Science in the United States: A Path Forward 150 (2009) (Strengthening Forensic Science).

[18]Forensic ballistics experts may also compare projectiles or cartridge casings recovered from other crime scenes in an effort to link unsolved crimes to the same weapon.

use or corrosion of the firearm over time. These characteristics in turn may impart different striated toolmarks onto the surface of a projectile, including on the land and groove engraved areas, which can also be observed by firearms examiners through a microscope.[19] See *id.* at 31-32, 45-49, 56-61; Theory of Identification I, *supra* at 87-88.

Forensic ballistics proponents maintain that a firearms examiner can determine whether two or more projectiles or cartridge casings were fired by the same weapon by comparing various characteristic toolmarks under a microscope. See Strengthening Forensic Science, *supra* at 150-151; Ballistic Imaging, *supra* at 55-56. One of the major difficulties in this endeavor is distinguishing so-called "class" and "subclass" characteristics, which create similar toolmarks among a group of weapons, from so-called "individual" characteristics, which create toolmarks that are theoretically unique to each weapon. See Ballistic Imaging, *supra* at 56-61.

The Association of Firearm and Toolmark Examiners's Theory of Identification (AFTE Theory of Identification) defines class characteristics as "[m]easurable features of a specimen [resulting from design factors] which indicate a restricted group source."[20] Theory of Identification, Range of Striae Comparison Reports and Modified Glossary Definitions — An AFTE Criteria for Identification Committee Report, 24 AFTE J. 336, 340 (1992)

---

[19]These are just some examples of firearm characteristics and their corresponding observable toolmarks. Other distinctive firearm characteristics include, but are not limited to, firing pins and the extractor or ejector mechanisms that remove spent ammunition cartridges. Firing pins may leave "impress[ed]" or impression-style toolmarks on cartridge casings when the casing is struck to initiate the firing process. These toolmarks may include the size, shape, and location of the firing pin impression, as well as smaller microscopic toolmarks resulting from surface variations of the firing pin itself. See Ballistic Imaging, *supra* at 32-35, 41-45. Similarly, the extraction or ejection mechanism for removing ammunition from a firearm can leave striated abrasion toolmarks on spent cartridge casings. See *id.* at 35, 44-45.

[20]The Association of Firearm and Toolmark Examiners (AFTE) is an organization of firearm and toolmark examiners that publishes the peer-reviewed AFTE Journal. The AFTE's Theory of Identification (AFTE Theory of Identification) is one of the primary methodologies used by firearm examiners to compare projectiles and cartridge casings. See Theory of Identification as it Relates to Toolmarks, 30 AFTE J. 86, 86-88 (1998) (Theory of Identification I); Ballistic Imaging, *supra* at 60-61, 64-67.

(Theory of Identification II). See Ballistic Imaging, *supra* at 57 (defining class characteristics as "general characteristics that separate a group of objects from a universe of diverse objects"). In the context of projectiles, the caliber of the ammunition, the number of lands and grooves, and the directional twist of the rifling are all class characteristics. See Ballistic Imaging, *supra* at 58. Identification of these class characteristics can narrow down the range of weapons that may have fired a particular projectile, including possibly identifying a single manufacturer and model of weapon, but they cannot be used to pinpoint an individual firearm as the weapon used in a shooting. See *id.* at 57-58.

Individual characteristics, on the other hand, are "random imperfections or irregularities of tool surfaces [that] are produced incidental to manufacture and/or caused by use, corrosion, or damage [of the tool]." Theory of Identification II, *supra* at 340. The individual characteristics that leave toolmarks on spent projectiles are microscopic variations of the gun barrel and rifling surfaces caused by random imperfections in the boring and rifling process, or by corrosion or use of the firearm over time. Individual characteristics are theoretically unique to each weapon, and they in turn impart theoretically unique microscopic striated toolmarks onto a projectile's surface when the weapon is fired. See Strengthening Forensic Science, *supra* at 150; Ballistic Imaging, *supra* at 56-58, 61; Theory of Identification II, *supra* at 339-340.

Subclass characteristics, however, can also result in microscopic striated toolmarks on a projectile's surface. See Strengthening Forensic Science, *supra* at 152; Ballistic Imaging, *supra* at 58-61; Theory of Identification II, *supra* at 339-340. The AFTE Theory of Identification describes subclass characteristics as features "[p]roduced incidental to manufacture [that] relate to a smaller group source (a subset of the class to which they belong)" and "[c]an arise from a source which changes over time." Theory of Identification II, *supra* at 340. Subclass characteristics can be created by the use of a particular machining tool to make a batch of weapons, the use of a specific manufacturing technique, or even a flaw in a manufacturing technique. Ballistic Imaging, *supra* at 58-61. Similar subclass characteristics can therefore appear in consecutively manufactured weapons or batches of weapons

from a particular manufacturer. Because subclass characteristic toolmarks may appear similar to individual characteristic toolmarks under a microscope, see id., the AFTE cautions that examiners must take care to distinguish subclass characteristics from individual characteristics.[21] See Theory of Identification II, *supra* at 340.

Firearms examiners generally attempt to identify a source weapon by locating individual characteristic toolmark patterns on spent projectiles and cartridge casings recovered at a crime scene and comparing these to projectiles or cartridge casings from test firings of a seized weapon or recovered from other crime scenes. The traditional "pattern matching" approach "relies on art (the cognitive ability to recognize agreement of pattern) and science (supporting the uniqueness of tool surfaces as a means to establishing an identification between a questioned toolmark and the tool that produced it)." Ballistic Imaging, *supra* at 64, quoting Moran, A Report on the AFTE Theory of Identification and Range of Conclusions for Tool Mark Identification and Resulting Approaches to Casework, 34 AFTE J. 227, 227 (2002). Under the AFTE Theory of Identification, a firearms examiner may offer an opinion that a projectile or cartridge casing was fired from a particular firearm when there is an "[a]greement of a combination of individual characteristics and all discernible class characteristics where the extent of agreement exceeds that which can occur in the comparison of toolmarks made by different tools and is consistent with the agreement demonstrated by toolmarks known to have been produced by the same tool." Ballistic Imaging, *supra* at 59. See Theory of Identification I, *supra* at 86.[22]

A 2008 National Research Council (NRC) report, which

[21]However, the AFTE Theory of Identification does not explain how subclass characteristics may be distinguished from individual characteristics. See Theory of Identification I, *supra* at 86-88; Theory of Identification, Range of Striae Comparison Reports and Modified Glossary Definitions — An AFTE Criteria for Identification Committee Report, 24 AFTE J. 336, 336-340 (1992) (Theory of Identification II).

[22]Some forensic ballistics experts will offer an opinion identifying a particular firearm as having fired a projectile or cartridge casing only if there are at least a certain number of consecutive matching striations (CMS technique). Although there is debate within the firearms examination community about the pros and cons of the AFTE Theory of Identification approach and the CMS technique,

contains one of the most comprehensive evaluations of the science underpinning the field of forensic ballistics, accepted as "a minimal baseline standard [that] firearms-related toolmarks are not completely random and volatile; one can find similar marks on bullets and cartridge cases from the same gun."[23] Ballistic Imaging, *supra* at 3. But the NRC report also recognized that there are two main problems with the present state of the art of firearms identification.

First, there is little scientific proof supporting the theory that each firearm imparts "unique" individual characteristic toolmarks onto projectiles and cartridge cases. See *id.* at 3, 70-81. As the NRC report stated: "The validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks [have] not yet been fully demonstrated" and a "significant amount of research would be needed to scientifically determine the degree to which firearms-related toolmarks are unique or even to quantitatively characterize the probability of uniqueness." *Id.* at 3. In essence, the NRC report concludes that the theory that each firearm has unique features that leave unique toolmarks on all spent projectiles and cartridge casings from that weapon finds support intuitively and anecdotally, but has yet to be proved scientifically. See *id.*

The second main problem with firearms identification is that the matching of individual characteristics, regardless of the technique used, is highly subjective. See *id.* at 53-67. The NRC report describes firearms identification as an "inherently subjective" discipline where "an examiner's assessment of the quality and quantity of resulting toolmarks and the decision of what does or does not constitute a match comes down to a subjective

both rely fundamentally on pattern matching and differ only in the criteria used to establish a match. See Ballistic Imaging, *supra* at 64-67. Trooper Brian Lombard appears to have relied on the AFTE approach in reaching his opinion.

[23]The 2008 National Research Council (NRC) report was commissioned to determine the feasibility of creating a national ballistic imaging database. Ballistic Imaging, *supra* at 2. Although the NRC report was not intended to be an assessment of the firearms identification discipline and did not make recommendations on the admissibility of firearms-related toolmark evidence, we are not aware of a more comprehensive evaluation of the field. See *id.* at 1-87. See also National Research Council, Strengthening Forensic Science in the United States: A Path Forward 150-156 (2009).

determination based on intuition and experience." *Id.* at 55, 82. This finding is echoed in the AFTE Theory of Identification which notes that "identification is subjective in nature, founded on scientific principles and based on the examiner's training and experience." Theory of Identification I, *supra* at 86.[24] The firearms examiner determines what areas on the projectiles or cartridge casings to compare, which toolmarks are meaningful, and how much similarity is sufficient to determine a match. The NRC report also concludes that there is little scientific data demonstrating the reliability of results. See Ballistic Imaging, *supra* at 54-67.[25]

At the motion hearing, the defense argued that the findings of the NRC report called into question the reliability of forensic ballistics expert testimony and that a *Daubert-Lanigan* hearing was required to assess the admissibility of the evidence. The judge, who had read the report, gave careful and extensive

[24]The AFTE Theory of Identification states that an examiner can offer an opinion of "common origin" when the surface contours of two toolmarks are in "sufficient agreement." Theory of Identification I, *supra* at 86. "[S]ufficient agreement," according to the theory, "means that the likelihood another tool could have made the mark is so remote as to be considered a practical impossibility." *Id.* In this context, "practical impossibility" is a subjective determination based on the examiner's training and experience. See *id.*

[25]We draw the analogy of a person attempting to identify a particular automobile solely from its external characteristics. The vehicle might first be identified by its make, model, and manufacturer, as well as its color, the number of doors, and the type of vehicle (e.g., sedan or truck). These characteristics would yield an indeterminate but discrete set of potentially matching vehicles. However, to identify a particular vehicle solely from its external characteristics, it would be necessary to identify a reasonable number of more distinctive features such as paint flaws or dents and scratches. Intuitively and logically, this can be done. Nevertheless, the preciseness of any such identification would be uncertain, both because of the difficulty of doing such comparisons and also because one could not be certain that multiple vehicles did not receive similar paint flaws or scratches on the factory floor. The difficulty of identifying individual vehicles solely from external characteristics is one reason why vehicles are stamped with vehicle identification numbers. It is for a similar reason that the NRC report found "[o]f particular interest" the use of "microstamping" to imprint firearm parts "so that known, unique markers are imparted on bullets or cartridge casings and a connection can be made to a gun (and its point of sale) without recovery of the gun itself." Ballistic Imaging, *supra* at 20. The NRC concluded that this technology, sometimes referred to as "ballistic ID tagging," is a more feasible alternative for forensic ballistic identification than trying to create a national forensic ballistic imaging database. See *id.* at 6-7, 20-21, 255-271.

consideration to the matter, and thoroughly questioned the prosecutor about Trooper Lombard's proffered testimony. The prosecutor stated that Trooper Lombard would testify to his observations regarding the various kinds of toolmarks on the projectiles and cartridge casings, including the "unique" or individual characteristic markings, and render an opinion of a match "based upon his training and experience and to a degree of scientific certainty." The judge concluded that, although the NRC report called into question the certainty with which a forensic ballistics match could be declared, the report clearly indicated that similar markings could be found on projectiles and cartridge casing from the same weapon and that firearm examiners could compare these markings, albeit subjectively. Thus, the judge determined that Trooper Lombard's testimony would be admissible without a *Daubert-Lanigan* hearing, but he conditioned and limited the scope of the expert's opinion. The judge ruled that the trooper could testify "to a degree of scientific certainty" that the recovered projectiles were fired by the nine millimeter firearm seized at 17 Morris Street provided he also admitted that he could not exclude the possibility that the projectiles were fired by another nine millimeter firearm.[26]

A judge's decision whether expert witness testimony satisfies the *Daubert-Lanigan* reliability standard is reviewed for abuse of discretion. See *Commonwealth* v. *Avila*, 454 Mass. 744, 764 (2009); Mass. G. Evid. § 702, at 218 (2010). We conclude that there was no abuse of discretion in the judge's admission of the expert opinion without a *Daubert-Lanigan* hearing, or in the condition he imposed on the admission of the opinion in light of the findings of the NRC report.

The purpose of expert testimony is to assist the trier of fact in understanding evidence or determining facts in areas where scientific, technical, or other specialized knowledge would be helpful. See *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25-26

---

[26]At trial, after hearing most of Trooper Lombard's direct testimony and his opinion that the three projectiles and spent cartridge casings were fired from the AB-10 Intratec nine millimeter firearm found at 17 Morris Street, the judge refined what he referred to as the "followup question" and required the prosecutor to ask whether the trooper could "exclude all other nine millimeter weapons that have six lands and six grooves with a right-hand twist . . . [a]s a matter of science."

(1994); *Commonwealth* v. *Francis*, 390 Mass. 89, 98 (1983); Mass. G. Evid., *supra.* "A judge has wide discretion in qualifying a witness to offer an expert opinion on a particular question, . . . and [the judge's] determination will not be upset on appeal if any reasonable basis appears for it" (citations omitted). *Commonwealth* v. *Mahoney*, 406 Mass. 843, 852 (1990). An evidentiary *Daubert-Lanigan* hearing is generally not required where we have previously admitted expert testimony of the same type, where the testimony is offered for the same purpose, and where there is no factual issue as to whether the expert is qualified, whether the appropriate methodology has been followed, or whether the quality of the evidence is sufficient to permit an opinion. See *Commonwealth* v. *Shanley*, 455 Mass. 752, 763 n.15 (2010); *Commonwealth* v. *Frangipane*, 433 Mass. 527, 538 (2001); Mass. G. Evid., *supra.*

The forensic ballistics testimony offered by Trooper Lombard, comparing projectiles and cartridge casings recovered as evidence of crimes with those test-fired from a particular firearm, has long been deemed admissible by this court. See, e.g., *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 471 (1942); *Commonwealth* v. *Millen*, 289 Mass. 441, 483, cert. denied, 295 U.S. 765 (1935); *Commonwealth* v. *Best*, 180 Mass. 492, 495-496 (1902). Although the NRC report called into question the exactitude with which a forensic ballistics expert could declare a "match," there was no evidence before the judge suggesting that firearms examiners could not assist the jury by using their technical expertise to observe and compare toolmarks found on projectiles and cartridge cases. The judge therefore had a reasonable basis to conclude that Trooper Lombard's expert testimony about his toolmark findings could assist the jury in determining whether any of the weapons recovered at 17 Morris Street was used in the shootings at 58 Cottage Street, and to admit this testimony without a *Daubert-Lanigan* hearing.

Nor did the judge abuse his discretion in allowing Trooper Lombard to offer his opinion only if he admitted on direct examination that he could not, as a matter of science, exclude every other nine millimeter firearm with six lands and six grooves with a right-hand twist. Given the absence of appellate guidance on this issue, the judge made a reasonable attempt to ensure

that the expert witness fairly informed the jury of his opinion as to a match and the limitations of that opinion.

The defendant further contends, however, that the judge erred in allowing Trooper Lombard, on cross-examination, to testify to his opinion without the limitation required by the judge on direct examination. On direct examination, the trooper conceded that, as a matter of science, he could not exclude every other nine millimeter firearm with six lands and six grooves with a right-hand twist. But on cross-examination, Trooper Lombard twice, without qualification (and without an objection or motion to strike), testified that the projectiles and cartridge cases found at the scene were "fired by that AB-10." On redirect examination, over objection, the trooper further testified that in his opinion it was a "practical impossibility" that the projectiles or cartridge casings came from any other AB-10 firearm.[27]

We find no prejudicial error here. While the opinions proffered by the trooper on cross-examination and redirect examination lacked the limitations the judge required on direct examination, we conclude that, considering the entirety of the witness's testimony, the jury were adequately informed of these limitations. The jury were told about the distinction between individual and class characteristics, and that the class characteristics found on the projectiles in this case, six lands and six grooves with a right-hand twist, could match potentially "hundreds" of firearms, including the Intratec AB-10 handgun found at 17 Morris Street. Although the trooper gave his opinion that the projectiles were a "match" to this particular Intratec AB-10 handgun based on the "unique markings" he observed and that he considered it a "practical impossibility" that another weapon could have fired these projectiles, this opinion was adequately tempered by Trooper Lombard's admissions that he had not compared the projectiles in this case with ones fired from any other Intratec AB-10 firearm and that he could not scientifically exclude the possibility that another weapon with similar class characteristics to an Intratec AB-10 had fired the projectiles.

In light of our ruling today and the findings of the NRC report, we offer the following guidelines to ensure that expert

[27]The term "practical impossibility" derives from the AFTE Theory of Identification. See note 24, *supra.*

forensic ballistics testimony appropriately assists the jury in finding the facts but does not mislead by reaching beyond its scientific grasp. First, before trial, the examiner must adequately document the findings or observations that support the examiner's ultimate opinion, and this documentary evidence, whether in the form of measurements, notes, sketches, or photographs, shall be provided in discovery, so that defense counsel will have an adequate and informed basis to cross-examine the forensic ballistics expert at trial. See *United States* v. *Green*, 405 F. Supp. 2d 104, 120 (D. Mass. 2005) (absence of notes and photographs by examiner "makes it difficult, if not impossible," for another expert to reproduce what examiner did); United States *vs.* Monteiro, U.S. Dist. Ct. Criminal No. 03-10329-PBS (D. Mass. Nov. 28, 2005) (AFTE guidelines require examiners to document identifications by notes, sketches, or photographs, and barring expert forensic ballistics testimony until adequate documentation is provided).

Second, before an opinion is offered at trial, a forensic ballistics expert should explain to the jury the theories and methodologies underlying the field of forensic ballistics. This testimony should include, but is not limited to, explanation of how toolmarks are imparted onto projectiles and cartridge casings; the differences between class, subclass, and individual characteristics of firearms; and the different types of resulting toolmarks that examiners look for and compare. Such testimony should also clearly articulate the differences between class and subclass characteristic toolmarks, which can narrow down the group of weapons that may have fired a particular projectile, and individual characteristic toolmarks, which potentially may permit an opinion that a particular firearm fired a projectile.[28] Such background testimony is essential to assist the jury in evaluating any opinion offered by the expert. See *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25 (1994) (purpose of expert testimony is to assist trier of fact); Mass. G. Evid., *supra* at § 702 (same). It is also similar to the type of informative background testimony that is commonly provided before admitting other expert opinions. See, e.g., *Commonwealth* v. *Patterson*, 445 Mass. 626, 628-634 (2005) (expert

---

[28]The lack of a firm scientific basis proving the uniqueness of individual characteristic toolmarks is a proper subject for both direct examination and cross-examination. See Ballistic Imaging, *supra* at 3.

fingerprint testimony); *Commonwealth* v. *Gaynor*, 443 Mass. 245, 263-270 (2005) (expert DNA testimony).

Third, in the absence of special circumstances casting doubt on the reliability of an opinion, and once these two things have been done, a forensic ballistics expert may present an expert's opinion of the toolmarks found on projectiles and cartridge casings. Where a qualified expert has identified sufficient individual characteristic toolmarks reasonably to offer an opinion that a particular firearm fired a projectile or cartridge casing recovered as evidence, the expert may offer that opinion to a "reasonable degree of ballistic certainty."[29] See *United States* v. *Taylor*, 663 F. Supp. 2d 1170, 1180 (D.N.M. 2009); United States *vs.* Diaz, U.S. Dist. Ct. No. CR 05-00167 WHA (N.D. Cal. Feb. 12, 2007); *United States* v. *Monteiro*, 407 F. Supp. 2d 351, 372 (D. Mass. 2006). Where the individual characteristic toolmarks are not so distinctive as to justify such an opinion, a qualified ballistics expert may still offer an opinion based on the class or subclass characteristics that narrow the scope of possible firearms or eliminate a class of possible firearms as the source of the spent projectiles or cartridge casings.[30]

The admission of an opinion to a "reasonable degree of ballistic certainty" is similar to the manner in which our appellate courts permit other empirically based but subjective opinions to be presented, such as the source of physical injuries or the cause of death, see, e.g., *Commonwealth* v. *Nardi*, 452 Mass. 379, 383 (2008) ("reasonable degree of medical certainty");

---

[29]A judge, where appropriate and based on the evidence, may impose further limitations on the expert's opinion, but may not allow an expression of certainty beyond a reasonable degree of ballistic certainty.

[30]We urge, but do not require, that an expert explain the basis of any opinion with sketches, photographs, or, best of all, comparison photographs. We are cognizant that all firearms examiners may not have access to the high-resolution cameras and printers necessary to recreate the images of what they see under a comparison microscope. Similarly, taking a two-dimensional photograph of a three-dimensional object's surface may not be the perfect substitute for actually viewing those contours under a comparison microscope. Nevertheless, the role of the expert is to assist the jury in determining fact, not simply to say "take my word for it." Moreover, what was true about comparison photographs in 1902 remains true in 2011. See *Commonwealth* v. *Best*, 180 Mass. 492, 495-496 (1902). To paraphrase Chief Justice Holmes, we see no other way in which a jury can learn so intelligently about how a particular gun could mark a particular projectile or cartridge casing. See *id.* at 495.

*Commonwealth* v. *DelValle*, 443 Mass. 782, 788 (2005) (same); clinical diagnoses, *Commonwealth* v. *Roberio*, 428 Mass. 278, 280 (1998) ("reasonable degree of scientific certainty"); and psychological opinions, *Commonwealth* v. *Wentworth*, 53 Mass. App. Ct. 82, 86 (2001) ("reasonable degree of psychological certainty"). It is also consistent with the NRC's recommendation that "[c]onclusions drawn in firearms identification should not be made to imply the presence of a firm statistical basis where none has been demonstrated." Ballistic Imaging, *supra* at 82. Cf. *Commonwealth* v. *Mattei*, 455 Mass. 840, 850-853 (2010) (because it is possible to say to mathematical degrees of statistical certainty that one DNA profile matches another, test results and opinions regarding DNA profile must be accompanied by testimony explaining likelihood of that match occurring in general population). Phrases that could give the jury an impression of greater certainty, such as "practical impossibility" and "absolute certainty," should be avoided.[31] Cf. *Commonwealth* v. *Gambora*, 457 Mass. 715, 727-728 (2010) (recognizing possibility that it may be error for fingerprint expert to state with absolute certainty that particular latent print matches known print, or that comparisons are error free). The phrase "reasonable degree of scientific certainty" should also be avoided because it suggests that forensic ballistics is a science, where it is clearly as much an art as a science. See Ballistic Imaging, *supra* at 54-56.

We recognize that some courts that have reviewed the research regarding forensic ballistics have come to different conclusions regarding the admissibility of such opinions. See *United States* v. *Glynn*, 578 F. Supp. 2d 567, 574-575 (S.D.N.Y. 2008) (permitting ballistics expert to offer opinion only that "firearms match was 'more likely than not' "); *United States* v. *Natson*, 469 F. Supp. 2d 1253, 1261-1262 (M.D. Ga. 2007) (permitting forensic ballistics expert to offer opinion of match "to a 100% degree of

---

[31]We note that the AFTE standards state that firearms examiners should be conservative and should not testify as to a match unless they consider it a "practical impossibility" that no other weapon could have been involved. See Theory of Identification I, *supra* at 86. While we do not permit an examiner to communicate this level of certainty, those who abide by the AFTE standards would not testify to a match to a "reasonable degree of ballistic certainty" unless they find it a "practical impossibility" that another firearm could be the source of the recovered projectiles or cartridge casings.

certainty"); *United States* v. *Green*, 405 F. Supp. 2d 104, 124 (D. Mass. 2005) (permitting forensic ballistics expert to testify only to expert's actual observations, and refusing to permit expert to offer opinion that particular firearm was source of recovered shell casings). We recognize that these decisions may have depended to some degree on the quality of the evidence on which the expert's opinion rested in a particular case, but as a general rule we believe that a middle ground permitting the opinion of a match to a "reasonable degree of ballistic certainty" under these guidelines more fully captures our current understanding of the scientific rigor underpinning forensic ballistics. As the NRC report concludes, toolmarks from firearms are not completely random and volatile, and similar markings can clearly be observed on projectiles and cartridge casings that come from the same fired weapon. See Ballistic Imaging, *supra* at 3. While the uniqueness of toolmarks has yet to be scientifically determined and while the process by which a firearms examiner declares a "match" remains inherently subjective, "the life of the law [is] experience," O.W. Holmes, Jr., Common Law 1 (American Bar Association ed. 2009), and that experience has demonstrated that firearms examiners can and consistently do compare such markings and reach opinions that can assist finders of fact. We conclude that, where defense counsel is furnished in discovery with the documentation needed to prepare an effective cross-examination, where a jury are provided with the necessary background regarding the theory and methodology of forensic ballistics, and where an opinion matching a particular firearm to recovered projectiles or cartridge casings is limited to a "reasonable degree of ballistic certainty," a jury will be assisted in reaching a verdict by having the benefit of the opinion, as well as the information needed to evaluate the limitations of such an opinion and the weight it deserves.

4. *Admission of the gunshot residue testimony.* The defendant contends that the judge erred by admitting in evidence, over the defendant's objection, Elana Foster's expert testimony on the results of gunshot residue testing performed on clothing seized as evidence and her opinion that the persons wearing these clothes had either discharged a firearm, been near a discharged firearm, or had come into contact with something that had gunshot

residue on it. The defendant contends that this testimony was irrelevant and that any relevance was outweighed by the testimony's potential prejudice to the defendant because the Commonwealth's expert could neither state when the residue was placed on the items of clothing nor distinguish whether the person wearing the clothing had fired a gun, been in the presence of a fired gun, or merely come into physical contact with someone who had fired a gun.

We conclude that this evidence was relevant because it suggested that the defendant and his codefendants had either recently fired a weapon, been in the presence of someone who had fired a weapon, or had come into contact with someone who had recently fired a weapon, which made more probable the Commonwealth's contention that the defendant was one of the armed intruders into the Finnerty home on May 16, 2005. See Mass. G. Evid. § 401 (2010) (relevant evidence "is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence"). Evidence does not have to be conclusive of an issue to be admissible. See *Commonwealth* v. *Arroyo*, 442 Mass. 135, 144 (2004).

We also conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice or the risk of misleading the jury. See *Commonwealth* v. *Rosario*, 444 Mass. 550, 557 (2005); Mass. G. Evid., *supra* at § 403. "Evidence is not rendered prejudicial merely because it is inconclusive." *Commonwealth* v. *Benoit*, 382 Mass. 210, 221 (1981). Here, the witness carefully explained the three ways that "unique particles" from gunshot residue could have ended up on the clothing, including the possibility that the particles could have resulted from coming into contact with someone who had recently fired a weapon. It was for the jury to determine whether that explanation was more probable than the other, more culpable inferences. See *Commonwealth* v. *Sylvia*, 456 Mass. 182, 191 (2010) (weight to give testimony is matter for jury). The judge did not abuse his discretion in admitting this testimony. See *id.* at 192, quoting *Commonwealth* v. *Simpson*, 434 Mass. 570, 578-579 (2001) ("Whether evidence is relevant and whether its probative value is substantially outweighed by its prejudicial effect are

matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error").

5. *Admission of the defendant's denials and invocation of rights.* When the defendant was interviewed at the Lynn police station on the morning of May 17, 2005, after the investigators questioned aspects of the defendant's story and suggested that he had been involved in the killings, the defendant ended the interview by invoking his right to remain silent under the Fifth Amendment to the United States Constitution and requesting to speak with an attorney. The defendant contends that the judge erred by admitting in evidence his invocation of his right to counsel and his right to remain silent. Because the defendant did not object to this evidence at the time of trial, we review for substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

The judge recognized that evidence that the accused invoked the right to counsel or the right to remain silent is not generally admissible at trial, see *Commonwealth* v. *DePace*, 433 Mass. 379, 382-384 (2001), *S.C.*, 442 Mass. 739 (2004), cert. denied, 544 U.S. 980 (2005), and advised the defendant that he would exclude the invocation if so requested. However, both the defendant and defense counsel informed the judge that they wished the entire recorded interview to be heard by the jury, including the invocation of the defendant's rights. Where inadmissible evidence is admitted because of a defendant's reasonable tactical decision, there is no substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Carmona*, 428 Mass. 268, 275-276 (1998); *Commonwealth* v. *Johnson*, 374 Mass. 453, 464-465 (1978), and cases cited.

As the judge noted, the defendant's desire to have the entire recorded interview admitted in evidence was an "understandable tactical decision." In closing argument, defense counsel told the jury that the defendant voluntarily answered police questions until he was accused of committing the murders, and only then invoked his rights. This theme of cooperation with police was pivotal to the defense theory of the case, which was that the defendant, when stopped by the police at 17 Morris Street shortly after the shooting, was merely in the wrong place at the wrong time, and that the police engaged in a "rush to judgment" in accusing him of the crime. Moreover, any risk

that the jury may have misused the defendant's invocation of rights was diminished by the judge's admonitions to the jurors, made after the interview was played and in his final charge, that they should not draw any negative inference from the defendant's exercise of his right to remain silent or his right to counsel. We find there was no substantial likelihood of a miscarriage of justice arising from the defendant's tactical decision to admit this otherwise inadmissible evidence.

The defendant also argues that the judge erred in admitting in evidence his repeated denials of wrongdoing, although he did not object to their admission at trial. In *Commonwealth* v. *Womack*, 457 Mass. 268, 276 (2010), we noted that, in those circumstances where it was error to admit a defendant's denials, "[t]he core of any prejudice is more likely caused by admission of the accusations than the denials," because it is generally "of great value to defendants" for the jury to hear "evidence of [a defendant's] prompt, clear, and emphatic denials without [the defendant's] having to testify." The defendant and defense counsel, by asking that the entire tape recording be played to the jury, apparently found value in the jury hearing his denials. In addition, defense counsel made use of the police accusations in his closing argument, stating that the police had lied to the defendant about the strength of the evidence they had obtained against him. We conclude that, in these circumstances and in the absence of objection, the judge did not err in admitting in evidence the defendant's denials and the hearsay accusatory statements of the police that triggered these denials.

6. *Admission of statements of the codefendant Phap Buth.* The defendant contends that the judge erred by admitting in evidence, over the defendant's objection, two statements made by Phap Buth. The first statement was made by Buth when he was stopped by police several hundred yards away from 17 Morris Street shortly after the shootings. Buth gave his name and told officers he had just gotten off a bus from Revere and was going to visit a friend "David" who lived on the street. Although Buth pointed to a white house, he could not provide "David's" last name. The defendant contends that this statement was admitted in violation of *Crawford* v. *Washington*, 541 U.S. 36 (2004), because Buth did not testify at trial and was not subject to cross-examination.

"The *Crawford* case reestablished the principle that testimonial out-of-court statements are inadmissible under the confrontation clause of the Sixth Amendment to the United States Constitution, regardless of local rules of evidence, unless the declarant is available at trial or the declarant formally is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant." *Commonwealth v. Gonsalves*, 445 Mass. 1, 3 (2005), cert. denied, 548 U.S. 926 (2006). However, the Supreme Court noted in the *Crawford* case that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington, supra* at 59-60 n.9. Likewise, we have stated that "admission of a testimonial statement without an adequate prior opportunity to cross-examine the declarant . . . violates the confrontation clause only if the statement is hearsay, that is, offered to prove the truth of the matter asserted." *Commonwealth v. Hurley*, 455 Mass. 53, 65 n.12 (2009). See *Commonwealth v. Caillot*, 454 Mass. 245, 255-256 (2009), cert. denied, 130 S. Ct. 1527 (2010).

The Commonwealth did not offer this testimony for the truth of the matter asserted. Rather, the testimony was offered for both its falsity and for its similarity to the defendant's statement about taking a bus from Revere to Lynn on the night of May 16, which the prosecution also argued was false. Consequently, the admission of Buth's statements to police was not error. See *Commonwealth v. Brum*, 438 Mass. 103, 116-117 (2002) (confrontation rights not implicated where statements offered to show defendant and another gave identical false statements).

The defendant also contends that the judge erred by admitting in evidence, over the defendant's objection, Buth's query to Jacquelyn Cordes whether she "knew anybody that would want to trade the marijuana [he had brought] for crack cocaine." On appeal, the defendant contends that this statement was improperly admitted as a hearsay statement of a joint venturer because the statement was not made during the pendency of the joint venture.[32] The defendant also argues that the judge never instructed the jury about the proper use of joint venture state-

---

[32]The transcript does not indicate a specific reason for defense counsel's objection during the trial. The defendant had moved in limine during empanelment to prevent Jacquelyn Cordes from testifying, arguing that her testimony

ments either after the statements were admitted or during his
final charge.

We need not reach the issue whether the statement was admissible as a joint venture statement, because Buth's question was
not offered for the truth of the matter asserted. Rather, it was
offered to provide context for the defendant's subsequent request
to Eang Logn to contact a drug dealer, which suggested that the
defendant was looking to obtain drugs through a robbery because
the defendant at the time had neither money to purchase nor
marijuana to trade for the drugs. Moreover, Buth's statement
added nothing of substance to Cordes's nonhearsay testimony
that Buth brought a large bag of marijuana to Logn's apartment,
which she helped him trade for crack cocaine. We conclude that
the judge did not err in admitting this statement.

7. *Admission of the surveillance videotape.* The defendant
contends that the judge erred by admitting in evidence, over the
defendant's objection, a copy of the surveillance videotape from
the Pet Express taken four or five hours before the shootings.
The defendant argues that this videotape should not have been
admitted because it was not properly authenticated by a representative of the Pet Express store. We discern no error in the
admission of the videotape. The videotape was authenticated by
Son's girl friend, who was at the store that evening with the
defendant, Son, and Son's sister. She testified that all four
individuals could be seen on the surveillance videotape, and
that it was a fair and accurate representation of their visit to the
store. Her testimony alone was sufficient to authenticate the
videotape.[33] See *Commonwealth* v. *Figueroa*, 56 Mass. App. Ct.
641, 646 (2002) (testimony that photograph depicts "a fair and

was irrelevant because it occurred prior to the day of the shootings and was
inadmissible evidence of a prior bad act. The judge reserved decision on the
motion, recognizing that the statement could support the prosecution's theory
that the home invasion leading to the murders was motivated by the desire to
steal drugs, depending on how much time passed between the statements and
the crime and the strength of other evidence of the alleged joint venture.

[33]In addition, the owner of the Pet Express store testified about the placement of the surveillance cameras within the store and the fact that they were
recording on May 16, 2005. Detective Stephen Pohle of the Lynn police
department also testified how investigators obtained a copy of the surveillance
videotape, which was done by videotaping a store security monitor playing
the original footage because the original footage could not be otherwise
downloaded or copied.

accurate representation of something the witness actually saw" sufficient to authenticate photograph); Mass. G. Evid. § 901(a), at 311 (2010) (principle that authenticity may be proved by testimony of qualified witness that item is what proponent represents it to be is "applicable to photographs as well as other forms of documentary evidence").

8. *Voir dire of jurors.* The defendant contends that the judge erred in questioning prospective jurors during individual voir dire, over defense objection, about whether potential evidence at trial regarding gangs or gang-related activity would affect the jurors' ability to be fair and impartial.[34] Gang-related testimony was never presented at trial, however, as the judge later barred the proffered evidence on hearsay and confrontation clause grounds. The defendant contends that this question therefore prejudiced or otherwise tainted the jury.

"The judge must examine jurors fully regarding possible bias or prejudice where 'it appears that there is a substantial risk that jurors may be influenced by factors extraneous to the evidence presented to them.' . . . The scope of the voir dire is in the sound discretion of the trial judge and will be upheld absent a clear showing of abuse of discretion." *Commonwealth* v. *Garuti*, 454 Mass. 48, 52 (2009), quoting *Commonwealth* v. *Morales*, 440 Mass. 536, 548 (2003). In this case, the prosecution proffered evidence regarding gang affiliations of the defendant and his codefendants, and the judge at the time of voir dire had not yet ruled on the admissibility of such evidence. It was prudent and reasonable for the judge to question potential jurors about their ability to remain impartial if there was gang-related testimony at trial. Eleven potential jurors were excused for cause specifically because they indicated they could not be impartial if such testimony were admitted. If these jurors had been empanelled and gang-related testimony were admitted at trial, the defendant's right to a fair trial might have been at risk.

The empanelled jurors were not tainted or prejudiced by the question regarding possible gang affiliation because the sitting jurors said they would be fair and impartial if gang-related

---

[34]The judge asked: "There may be evidence in this case that some of the people involved were or may have been involved or affiliated with a gang or gangs. Would that affect your ability to be a fair and impartial juror?"

testimony were presented during trial. It is illogical to suggest that the empanelled jurors could be fair and impartial while hearing actual testimony regarding gang affiliations, but were somehow prejudiced by the mere suggestion during voir dire that such testimony might possibly arise. There was no abuse of discretion and no error in asking the voir dire questions.

9. *Letter from juror.* On June 9, 2005, six days after the verdict, a juror sent a letter to the judge suggesting that she and possibly two other jurors had been pressured into convicting the defendant despite having a reasonable doubt concerning the defendant's guilt. According to the juror, other jurors "lean[ed] across the table into our faces and insist[ed] on yelling at us, screaming, swearing, and throwing books and pens just because we [saw] some things differently." After the other two holdouts changed their minds, the juror claimed that she was subjected to "8 hours of constant interrogation," with jurors "constantly yelling at me and swearing and pointing finger[s] in my face across the table and telling me that I am crazy." The letter further alleged that some jurors had made up their minds "from day 1 without listening to anything that was presented," that some jurors convinced or intimidated others to change their votes outside the jury room, and that the foreperson at one point refused to send the judge a note saying that the jury were deadlocked and instead insisted that they continue deliberating.[35]

The judge sent a copy of the letter to counsel on June 16, 2008, along with his own letter declaring that he did not believe any action should be taken because the juror's complaints in the letter did not allege an extraneous influence on the jury, did not "rise to the level of juror misconduct," and related to the jury's "internal decision making process." The defendant filed a motion to reconsider on November 10, 2008, which was denied. The defendant subsequently filed a notice of appeal, preserving the issue for appeal. The defendant contends that the letter indicated irregularities in the jury deliberation process, and that

---

[35]The jury did send a note to the judge on the third day of deliberations indicating that they were deadlocked and the judge gave a *Tuey-Rodriquez* charge, an instruction designed to encourage the jury to reach a verdict. See *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 98-101, 101-103 (1973) (Appendix); *Commonwealth* v. *Tuey*, 8 Cush. 1, 2-4 (1851). The jury convicted the defendant the following day.

the judge erred in failing to make postverdict inquiry of the juror in court. In the alternative, the defendant contends that the judge erred by notifying counsel of his decision on the matter before giving counsel a copy of the letter and an opportunity to be heard. We review the judge's decision for abuse of discretion. See *Commonwealth* v. *Pena*, 455 Mass. 1, 9-11 (2009).

With few exceptions, we adhere to the principle that "it is essential to the freedom and independence of [jury] deliberations that their discussions in the jury room should be kept secret and inviolable." *Commonwealth* v. *Fidler*, 377 Mass. 192, 196 (1979), quoting *Woodward* v. *Leavitt*, 107 Mass. 453, 460 (1871). A judge receiving a postverdict letter or affidavit from a juror has no duty to investigate or to conduct an evidentiary hearing "unless the court finds some suggestion or showing that extraneous matters were brought into the jury's deliberations," *Commonwealth* v. *Dixon*, 395 Mass. 149, 151 (1985), or that a juror made a statement to another juror that reasonably demonstrates racial or ethnic bias. See *Commonwealth* v. *McCowen*, *ante* 461, 494 (2010). See also *Commonwealth* v. *Semedo*, 456 Mass. 1, 22-24 (2010); *Commonwealth* v. *Laguer*, 410 Mass. 89, 97 (1991); *Commonwealth* v. *Fidler*, *supra* at 203; Mass. G. Evid., *supra* at § 606(b), at 177-178. An extraneous matter may include an improper communication to a juror by a third party or improper consideration by a juror of information not in evidence. See *Commonwealth* v. *Semedo*, *supra* at 22-23; *Commonwealth* v. *Fidler*, *supra* at 197. Even where an evidentiary hearing is appropriate, "evidence concerning the subjective mental processes of jurors, such as the reasons for their decisions," is inadmissible to impeach a verdict. *Id.* at 198.

None of the allegations in the letter constituted an extraneous influence on the jury or a claim of racial or ethnic bias. Instead, the letter detailed stresses that sometimes surface in the deliberative process required to get twelve individuals with differing views of the evidence to reach a unanimous verdict. "Tension between jurors favoring guilt and those favoring acquittal is part and parcel of the internal decision-making process of jury deliberations." *Commonwealth* v. *Semedo*, *supra* at 23, quoting *Commonwealth* v. *Mahoney*, 406 Mass. 843, 855 (1990). That these stresses and tensions may be keenly felt by some jurors

does not automatically call into question a verdict. See *Commonwealth* v. *Martell*, 407 Mass. 288, 295 (1990), quoting *United States* v. *Stoppelman*, 406 F.2d 127, 133 (1st Cir.), cert. denied, 395 U.S. 981 (1969) ("fact that some jurors have weaker wills than others — or that one individual may bow to the pressure of eleven — cannot be a cause for reopening a case"). Likewise, the juror's claim that two of the other holdout jurors were "intimidat[ed]" into changing their votes outside the jury room by other jurors is not an extraneous influence. See *Commonwealth* v. *Mahoney*, *supra* at 856 (jurors' disregard of judge's instructions that they not discuss case except during deliberations is not extraneous influence in absence of facts that discussions involved matters not in evidence). The judge did not abuse his discretion in failing to make a postverdict inquiry of the juror.

Nor was it an abuse of discretion for the judge to decide the issue before informing counsel of the letter and giving counsel an opportunity to be heard, although the better practice is to postpone decision until counsel have had such an opportunity. Cf. *Commonwealth* v. *Floyd P.*, 415 Mass. 826, 833 (1993) (when jury communication of legal significance is received by judge before jury return verdict, "counsel should be given the opportunity to assist the judge in framing an appropriate response and to place on record any objection they might have to the course chosen by the judge"); *Commonwealth* v. *Donovan*, 15 Mass. App. Ct. 269, 272 (1983) ("once a trial judge becomes aware of circumstances indicating an irregularity in jury deliberations" prior to verdict "judge should inform counsel for both sides, on the record [and] should endeavor to correct the problem"). Here, the judge immediately informed counsel of his receipt of the juror's letter, his decision not to conduct an inquiry of the juror, and his reasons. By doing so, the defendant had adequate opportunity to protect his rights by objecting to the judge's ruling and moving for reconsideration, which he did. The judge fully considered the motion and the issue was preserved for appeal and review by this court. There was no unfair prejudice to the defendant.

10. *Relief pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E,

and considered the defendant's claims of ineffective assistance of counsel. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992) ("statutory standard of § 33E [review] is more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel"). We discern no error that produced a substantial likelihood of a miscarriage of justice, nor any other reason to order a new trial or to reduce the defendant's murder convictions to a lesser degree of guilt.[36]

*Judgments affirmed.*

---

[36]Because the defendant was convicted of murder in the first degree on a theory of deliberate premeditation, we need not address whether the convictions of murder in the first degree on a theory of felony-murder comport with the merger doctrine. See *Commonwealth* v. *Pagan*, 440 Mass. 84, 92-93 (2003). See also *Commonwealth* v. *Kilburn*, 438 Mass. 356, 359 (2003); *Commonwealth* v. *Gunter*, 427 Mass. 259, 272, 275-276 (1998).